Julia DALEY, Plaintiff and Appellee,

v.

Emma L. GUNVILLE, Defendant
and Appellant.

Civ. No. 10538.

Supreme Court of North Dakota.

April 24, 1984.

Richard L. Burns, Legal Assistance of
North Dakota, Inc., Devils Lake, for de-
fendant and appellant.

John R. Gregg; Bottineau, for plaintiff
and appellee.

GIERKE, Justice.

In this case Julia Daley [Julia] petitioned
the District Court of Rolette County for
the issuance of a writ of habeas corpus,
pursuant to Chapter 32–22 of the North
Dakota Century Code. Julia alleged that
her daughter, Kathryn Louise Maddox [Ka-
tie], was being wrongfully detained in the
custody and control of the child's maternal
grandmother, Emma L. Gunville [Emma].
A writ of habeas corpus was issued by the
district court. The writ came on for hear-
ing on November 19, 1982, at which time it
was stipulated that Emma would retain
custody of Katie until the end of the school
year and Julia would have visitation with
Katie at Lewistown, Montana, over the
Christmas vacation period. At the end of
the school year, Julia was to receive perma-
nent custody of Katie "unless Social Servic-

es' home studies indicate that it is not in the best interests and welfare of Kathryn L. Maddox to remain in the Daley home". The court, however, did not dismiss the proceedings, but, rather, continued them and authorized a hearing on the merits on twenty days' notice to the opposing party. Pursuant to the stipulation, evaluations were ordered to be prepared and submitted by Social Services, assessing the living situation, family and medical background, and resources of the parties. The court also ordered that Katie be referred for professional evaluation. Reports were received from the Fergus County, Montana, Department of Public Welfare; the Lake Region Human Service Center, Devils Lake, North Dakota; and evaluations were received from psychologists Dr. Jeffrey R. McKee and Dr. Olov Gardebring. Unsatisfied that a change in custody would be in Katie's best interests, Emma requested a trial on the merits. The trial was held on July 25, 1983. The district court then issued its memorandum opinion and order granting the writ of habeas corpus and awarding custody of Katie to her natural mother, Julia. From that order Emma appeals. The district court's order has been stayed pending this appeal.

Katie was born to Julia on October 4, 1977. She was the second child born out of wedlock to Julia. The first child was Dale, born January 11, 1975. Katie's natural father is in no way connected with these proceedings.

While Julia was living in Montana she experienced a great deal of stress while pursuing certain educational programs and dealing with two children. Rather than place Katie in a foster home, Julia made arrangements to place Katie, then six months old, with Katie's grandmother, Emma Gunville. Katie has resided with the Gunvilles at Dunseith since that time.

On August 21, 1979, Julia married Terry Daley. A son, Gary, was born May 15, 1983. The family, consisting of Julia, Terry, Dale, and Gary, presently resides in Lewistown, Montana. Both Julia and Terry are employed.

Emma Gunville is 54 years of age. For the past 21 years, except for two intervals, Emma has lived with Robert Gunville. They are not married. Four children have been born to Robert and Emma: Sylvia, Toni, James, and Lloyd. The family resides in a home north of Dunseith. Currently living in the home, in addition to Robert, Emma, and Katie, are: Lloyd, age 16; Toni, age 18; Carl Maddox, age 23 (Emma's son by a previous marriage); and Toni's fiance, Danny. Robert Gunville is employed as a resident care technician at the San Haven State Hospital. Emma is also employed at the San Haven State Hospital.

In 1969, Robert and Emma separated for a period of two or three months. During the separation, Robert married another woman in Montana. It appears that divorce proceedings were commenced regarding this marriage, but it is not clear if the divorce was ever finalized. Robert and Emma also separated in 1981 for approximately one year, during which time Robert visited the home almost every day.

Emma, as stated, is 54 years old. She suffers from a degenerative hip condition and has high blood pressure. Both conditions are controlled with medication. She is, nevertheless, an active woman whose "ailments" have little discernible effect on her activities. Emma testified that her hip would require surgery sometime in the future.

During the five-and-one-half-year period between April 1978, when Katie came to live with Emma, and the initiation of these proceedings in November 1982, Julia visited her daughter a total of three times. Only one of these visits was initiated by Julia and that visit was motivated, at least in part, by a desire to leave her other child, Dale, with Emma while Julia searched for a job. This visit occurred around the beginning of January 1979. Julia stayed in Dunseith for approximately two weeks before returning to Montana. Dale remained with Emma for approximately one month before returning to Montana with Julia's grand-

mother, who also lives in Lewistown. Katie remained with Emma.

The next visit was in February or March of 1980. On that occasion Emma and Katie traveled to Lewistown, Montana, to visit Emma's son, who had been injured in a motor vehicle accident. Julia visited Katie at that time in the home of Katie's great-grandmother. Following this brief visit, Emma and Katie returned to Dunseith.

The third visit occurred during the summer of 1982. It was Julia's testimony that Emma had suggested this visitation because she did not want to keep Katie from her mother. She suggested a summer visitation in Lewistown and further suggested that a decision regarding whether or not Katie would live permanently with Julia would be made at the end of the summer. Emma testified that Katie was to be returned in mid-August. Katie was not returned at that time. Because of the prolonged visitation and because of certain alleged incidents in the Daley home which she had heard about, Emma went to Lewistown and enlisted the aid of the sheriff, who removed Katie from Julia's custody.[1] Emma and Katie then returned to Dunseith. These habeas corpus proceedings were commenced shortly thereafter.

During that same five-and-one-half-year period, Katie received no letters from her mother, only three or four cards, and three or four gifts. Julia provided one dress for Katie during that period. The Gunvilles have provided all support. There has been some phone contact between Julia and Katie. The frequency of the calls as well as who originated them is disputed. Julia testified, however, that she telephoned her mother "once every three months at least, at least". Additionally, Katie recognizes to some extent that Julia is her natural mother.

In *Mansukhani v. Pailing*, 318 N.W.2d 748, 750 (N.D.1982), this court recognized that:

"... [P]arents have a right to the custody and companionship of their children superior to that of any other person and that, although such right is not absolute, the courts are reluctant to remove a child from the parent's custody unless it is necessary to prevent serious detriment to the welfare of the child."

In *Mansukhani, supra* 318 N.W.2d at 754, we approved the following language from *Painter v. Bannister*, 258 Iowa 1390, 140 N.W.2d 152, 156, *cert. den.*, 385 U.S. 949, 87 S.Ct. 317, 17 L.Ed.2d 227 (1966):

"There is no merit in the Bannister claim that Mr. Painter permanently relinquished custody. It was intended to be a temporary arrangement. A father should be encouraged to look for help with the children, from those who love them without the risk of thereby losing the custody of the children permanently. This fact must receive consideration in cases of this kind. However, as always, the primary consideration is the best interest of the child and if the return of custody to the father is likely to have a seriously disrupting and disturbing effect upon the child's development, this fact must prevail."

In the case of *In re Buchholz*, 326 N.W.2d 203, 207 (N.D.1982), we stated that:

"When there is a custody dispute between a natural parent and a third party ..., the test is whether or not there are exceptional circumstances which require that, in the best interests of the child, the child be placed in the custody of the third party rather than with his or her biological parent. *Mansukhani v. Pailing*, 318 N.W.2d 748, 751 (N.D.1982)....

"Exceptional circumstances exist when the custody dispute pits the psychologi-

---

1. The sheriff relied on the authority of a Turtle Mountain Tribal Court order of temporary guardianship. Emma obtained that order in an effort to secure a means of medical coverage for Katie. The Tribal Court issued its order upon receipt from Emma of Julia's written statement relinquishing custody of Katie to Emma. Julia was unaware that the statement would be used to obtain such an order. The proceedings in Tribal Court were held without notice to Julia. The validity of this order of temporary guardianship and its effect on these proceedings has not been placed at issue and we do not consider it.

cal parent against the natural parent. *In Interest of D.R.J.*, 317 N.W.2d 391, 394 (N.D.1982)."

Dr. Gardebring testified in his deposition that the Gunvilles were Katie's psychological parents. Dr. Gardebring also testified that Katie had initially formed an attachment to Julia, but that the first change in custody from Julia to the Gunvilles was a severe disruption; that a second change would compound the disruption; that there is a bonding between Katie and the Gunvilles; and that it would be in Katie's best interest to remain with them. According to Dr. Gardebring, when he asked Katie where she wanted to live, she responded that "She wished that all four of them would be together, but not separately". The doctor interpreted this response as a fear of going to Montana rather than a demonstration of bonding between Katie and her mother—a conclusion which he stated is further supported by Katie's request that his notes be taken in French rather than in English.[2]

The district court did not fully accept Dr. Gardebring's conclusions for a number of reasons. The court noted that:

"... Dr. Gardebring met with the Gunvilles and Katie, but not with Julie [*sic* ], and that meeting at most lasted two hours, 50 minutes of which were with Katie alone and 40 minutes with Katie and the Gunvilles. It is difficult to term this an in-depth consultation ..."

The court also pointed out that Doctor Gardebring was unaware that the Gunvilles were not married. He was also unaware, until informed by counsel at the very end

of his deposition, that Katie had an older brother living with the Daleys. Finally, the court noted that:

"... Dr. Gardebring relied greatly, if not entirely, upon the maxims of *Beyond the Best Interests of the Child*, a work which Dr. Gardebring admitted has received some criticism."

Despite its reluctance to credit all of Dr. Gardebring's conclusions, the district court found that the Gunvilles were Katie's psychological parents, thus concluding that exceptional circumstances exist which would justify an award of custody to the Gunvilles. The court nevertheless determined that "countervailing factors", *Mansukhani, supra* 318 N.W.2d at 754, required that Katie be transferred to her mother's custody:

"The Gunvilles have never married. Emma has remained faithful and loyal to Robert, as she says, for 21 years. He has not. Although his relationship with Emma has existed for 21 years, they have not seen fit to marry. Yet during a two months separation, he married another woman. Little interest was shown by Emma in determining the status of that marriage. The fact that Toni and her fiance reside in the Gunville residence lends itself to some conjecture. Emma, at 54, suffers from a serious physical problem, a deteriorating hip, a condition that does not lend itself to a solution of teenage problems by the aging parent. Robert Gunville did not testify, but the record is replete with his unfortunate problems. Emma is the

**2.** In its memorandum opinion, the district court discounted Dr. Gardebring's conclusion in this regard, stating that his observation "could lend itself to an interpretation that she didn't want to remain in North Dakota". The district court's interpretation is not supported by the record in this case.

During the deposition the following exchange took place between Julia's counsel and Dr. Gardebring:

"Q Did she say that she was afraid to go to Montana?

"A The implication here is—

"Q No, Doctor, the question is: Did she say that she was afraid to go to Montana?

"A Will you protect her? I must ask this. Will you protect her, because that is very important to me.

"Q Doctor, I know you are concerned about Katie and the family and we all are, but my question is: Did Katie say that she was afraid to go to Montana?

"A *She said she doesn't want to.* And, again, I must say here that I've an overriding concern about her and this is very strongly—she asked me not to take notes in English but in French. She is very fearful of going to Montana...." [Emphasis added.]

mainstay of the Gunville family. Even though there can be no question but that Emma loves Katie, nevertheless, there is little prospect of family stability should something happen to Emma.

"On the other hand, Julie has straightened out her life, and the Daleys have a solid family life and home. Terry wants to adopt Dale. There is no reason to believe but that Katie is loved by the Daleys and has been welcomed into that home, albeit there has been some sister-brother adjustment. Julie impressed this Court as having a deep maternal love and a genuine concern for her daughter, and that there has been some bonding between Katie and her mother and the Daley family.

"It is concluded that placement of Katie with her natural mother and family would be placement in a stable home with a promise of future stability, and that with the other factors mentioned in this opinion, it is in the best interests of Katie that she be placed with her natural mother and her application for writ of habeas corpus is granted.

"It is recognized that there will be trauma experienced by Katie regardless of what the Court does in this proceeding, but the disruption now experienced by Katie because of placement with her natural mother will be far less than that to be expected if there would be a present placement with the Gunvilles and then for some reason a change again would be required."

Emma has raised two issues on appeal:
1. Did the trial court give sufficient weight to the testimony of the expert witnesses presented by Emma; and
2. Was the trial court's determination to return Katie to Julia's custody clearly erroneous?

We begin by noting that a habeas corpus proceeding to determine the custody of a child is in the nature of an equitable action and is to be determined on equitable principles by what appears to be in the best interests of the child. *Mansukhani v. Pailing,* 300 N.W.2d 847, 850 (N.D.1980);

*In re Wagner,* 84 N.W.2d 587, 588 (N.D. 1957). The district court's child custody determination in a habeas corpus proceeding is a finding of fact which will not be set aside on appeal unless clearly erroneous. *Mansukhani v. Pailing,* 318 N.W.2d 748, 751 (N.D.1982); Rule 52(a), N.D.R.Civ.P. This court will not set aside the trial court's findings of fact unless, upon a review of the entire record, we are of the definite and firm conviction that a mistake has been made. *Muraskin v. Muraskin,* 283 N.W.2d 140, 142 (N.D.1979).

Before turning to the issues Emma has raised, we note that, by all accounts, Katie is a bright, happy, energetic girl, whose school and community records are good. There is no contention that the love, care, and guidance provided by Emma were in any way inadequate.

We turn now to Emma's contention that the trial court did not give sufficient weight to the testimony of the expert witnesses. In *Mansukhani v. Pailing, supra* 318 N.W.2d at 751, we stated that:

"Although the district court, as trier of fact, is the judge of the credibility of expert witnesses and the weight to be given their testimony it cannot arbitrarily disregard such testimony. *See, Gardebring v. Rizzo,* 269 N.W.2d 104 (N.D. 1978)."

In the instant case, Dr. Gardebring testified that Emma and Robert were Katie's "psychological parents". He also testified that Katie would suffer some harm if she were removed from the Gunville home. The trial court acknowledged these facts in its memorandum opinion. The establishment of a psychological parent relationship does not, however, end the trial court's inquiry. It merely furnishes a justification for the award of custody to a party other than the natural parent. It remains to be determined if such an award would be in the child's best interests. Dr. Gardebring was not in a position to offer anything other than a general opinion on this subject because he was without much of the information relevant to that inquiry. It was for the trial court to weigh Dr. Gardebring's

opinion against the specific facts and circumstances of this case in determining what would be in Katie's best interests. We cannot conclude from the record that the trial court gave insufficient weight to his testimony.

·The trial court did not make specific findings of fact regarding the factors affecting the best interests and welfare of the child as listed in § 14–09–06.2, N.D.C.C. It is, however, evident from the record of the case and from the court's memorandum opinion that evidence on these factors was presented and considered by the trial court. See Lapp v. Lapp, 293 N.W.2d 121, 128 (N.D.1980).[3]

This court has repeatedly stressed the importance of continuity and stability in a child's life, especially in the life of a young child, as factors in determining the child's best interests. See Mansukhani, supra 318 N.W.2d at 753, and cases cited therein. It is beyond dispute that Emma has been the only source of stability and continuity in Katie's life. It is also clear that Katie has progressed well under Emma's guidance.

One of Julia's principal allegations in support of her claim concerns Robert's use of alcohol. The district court summarized the evidence in that regard as follows:

"Robert is either a reformed alcoholic, or an alcoholic, or a near alcoholic. The record is not clear as to his addiction to alcohol. . . ." [Emphasis added.]

If Robert is a reformed alcoholic, he is more to be commended than condemned. If, however, he is an alcoholic or a near alcoholic, that is certainly a major factor affecting Katie's best interests. The district court found, however, that the evidence was insufficient to establish Robert's possible abuse of alcohol and we do not, therefore, consider it.

■ In awarding custody of Katie to Julia, the district court placed principal reliance on the uncertain status of Robert's and Emma's relationship and on Emma's physical health. These circumstances are certainly relevant factors to be considered in determining a child's best interests.

In Lapp v. Lapp, 336 N.W.2d 350, 353 (N.D.1983), this court concluded that:

". . . the circumstances of 'living together' alone does not mandate a transfer of custody. As always, the court's main priority is the best interests of the child involved."

An arrangement such as that of the Gunvilles raises concerns, not only regarding "moral fitness", see Lapp v. Lapp, supra 336 N.W.2d at 352; Larson v. Larson, 294 N.W.2d 616, 619 (N.D.1980), but also of the stability of the relationship between the "parents", which is of such importance to a child. In the ordinary case, such a relationship does not exhibit a strength of commitment upon which a court might rely in making an initial award of custody. By contrast, Robert and Emma have maintained their relationship for over 21 years. Throughout the course of their relationship Emma has remained faithful to Robert. There is no evidence that Robert has been any less faithful to Emma since his return, fifteen years ago, following the Montana marriage. Although the Gunvilles have been separated once since Katie came to live with them, Robert's almost daily presence at the home throughout this separation causes little concern regarding the commitment and stability of the relationship. We do not condone the Gunvilles' failure to formalize their relationship or their apparent lack of concern regarding the possible consequences of this failure to their children, to Katie, and to each other. Nor do we conclude that there is no cause for concern regarding the moral atmo-

---

3. Although the trial court properly considered the factors affecting the child's best interests, its reference to these factors as "countervailing" was misplaced. Countervailing factors are those public policy issues which might require a custody placement adverse to the child's best interests. In Mansukhani, supra, the case relied on by the trial court, a countervailing factor ·discussed by this court was whether the public policy of discouraging interference with visitation rights might be sufficiently important to deny custody of a child to the child's psychological parents who had allegedly interfered with the visitation rights of the natural mother.

sphere to which Katie is exposed. This concern, however, does not rise to the level of concern evident in previous discussions of this issue. *See* e.g., *Jacobson v. Jacobson*, 314 N.W.2d 78 (N.D.1981) (custody award to parent living in open homosexual relationship reversed); *Larson v. Larson*, 294 N.W.2d 616 (N.D.1980) (parent seeking custody had had several live-in lovers over the course of a few years).

Turning now to Emma's physical health, we note that, like many of the factors listed in § 14–09–06.2, N.D.C.C., Emma's health and its effect on Katie's development is largely a matter for conjecture. We do not mean to suggest that actual adverse effect must be demonstrated before physical health can be considered in making a custody award. The district court's finding in this case, however, is, in our view, somewhat speculative. Although there is little, if any, doubt that Emma will have to undergo hip-replacement surgery at some time in the future, there is no reliable evidence regarding when such surgery might become necessary, the extent of possible disability resulting from such surgery, or how the resultant disability might affect Emma's ability to care for Katie. It is entirely possible that Emma could continue to care for Katie and make positive contributions to her development in spite of, or even because of, a possible handicap. These events are simply too far removed from the present to justify the removal of a six-year-old child from an environment where she feels secure and loved and is progressing satisfactorily.

We are of course aware that Emma may become so disabled as to be incapable of properly caring for Katie. We do not, however, agree with the district court's conclusion that a present disruption would be far less harmful to Katie's development than a possible change in the future, should Emma's condition warrant it. There is no reason to believe that Katie will not continue to develop in judgment and maturity and thereby be capable of recognizing and appreciating the reasons why a change might be required. Recognizing this possibility, we hope that Julia will, for her own sake and for Katie's sake, avail herself of the opportunity to establish a meaningful parent-child relationship with Katie—an opportunity which Julia ignored for the greater part of Katie's life. It is possible that at some future time changed circumstances, such as the establishment of a meaningful parent-child relationship, might warrant further judicial action. At this point, however, it is clear that no such relationship has been established.

In conclusion, after reviewing the entire record, we are convinced that the circumstances of this case are insufficient to warrant the removal of a happy, healthy, well-adjusted six-year-old child from the only home she has ever known.

For the reasons set forth in the opinion, we vacate the order of the district court, and we remand with directions that the court enter an order placing custody of Katie with Emma Gunville, and awarding Julia liberal visitation rights. Costs on appeal awarded to Emma.

ERICKSTAD, C.J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.