In the Interest of J.K.S., a Child.

James TWOMEY, Petitioner
and Appellee,

v.

G.S., Respondent and Appellant,

J.K.S., Steven Mottinger as counsel and guardian ad litem for J.K.S., Thomas Jensen, Director of Cass County Social Services, Respondents.

Civ. No. 10605.

Supreme Court of North Dakota.

Oct. 23, 1984.

James F. Twomey, Asst. State Atty., Fargo, for petitioner and appellee; argued by James F. Twomey, Fargo.

Edward J. Murphy, Fargo, for respondent and appellant.

Steven Mottinger, Guardian ad Litem, Fargo, for J.K.S. on oral argument.

PEDERSON, Justice.

This is an appeal by the natural mother (G.S.T.), formerly G.S., from an order entered by the district court terminating G.S.T.'s parental rights to her minor daughter (J.K.S.). G.S.T. contends there was insufficient evidence to meet the statutory prerequisites for terminating parental rights under § 27–20–44(1)(b), NDCC. For the reasons stated herein we affirm the order terminating G.S.T.'s parental rights to J.K.S.

G.S.T. has been before this court two other times concerning custody of J.K.S. The facts supporting a finding of deprivation in those instances have been set out in full in our earlier opinions and will not be repeated here except to the extent necessary. *See, In Interest of J.K.S.*, 321 N.W.2d 491 (N.D.1982); *In Interest of J.K.S.*, 274 N.W.2d 244 (N.D.1979).

G.S.T., an unmarried minor, gave birth prematurely to J.K.S. in a Fargo hospital in May 1977. J.K.S. remained in intensive care until the middle of June. The hospital records revealed that the hospital staff was concerned about G.S.T.'s attitude toward J.K.S. Near the end of June 1977, G.S.T. had an altercation with her father, with

whom she resided, and moved with J.K.S. to the home of Phyllis LaFrambois.

A series of events which took place on July 14, 1977, precipitated a petition to have J.K.S. declared a deprived child. J.K.S. was placed in the temporary custody of the County Director of the Cass County Social Service Board (Director). On August 16, 1977, the juvenile court issued its order affirming the findings and recommendations of the juvenile referee that J.K.S. was a deprived child and should be placed in the custody of the Director for a two-year period. G.S.T. requested a review of the findings and recommendations pursuant to § 27-20-07(5), NDCC, and on January 30, 1978, the court issued its order reaffirming the referee's findings of fact and recommendations. G.S.T. then appealed to this court.

We determined that although much of the evidence relied on by the juvenile court was not clear and convincing, when the evidence was considered cumulatively, two considerations established deprivation. First, J.K.S. was a premature infant who needed special care and G.S.T. had shown less than adequate concern for J.K.S. and had resisted efforts to improve her child-rearing skills. Second, G.S.T. had stated that she would remove J.K.S. from the jurisdiction of the court if she regained custody. Because the order was subject to continuing review and was not a termination of parental rights, we affirmed. *In Interest of J.K.S.*, 274 N.W.2d 244 (N.D. 1979).

The juvenile court extended its original order through August 17, 1981. On September 14, 1981, after a continued deprivation hearing, the juvenile referee recommended that the original order be extended through March 16, 1982. G.S.T. again requested review of the referee's findings and recommendations. These were affirmed on October 19, 1981 and G.S.T. appealed that order to this court.

The records, files and transcripts showed that G.S.T. had made no real effort to see or maintain contact with J.K.S. for a period of nearly two and one-half years. The juvenile court failed to make a specific finding of continued deprivation but implicitly made such a finding, which is supported by clear and convincing evidence. We did not overlook the fact that G.S.T. had married shortly before the continued deprivation hearing and her life had apparently changed for the better. We affirmed the order of the juvenile court because it would not have been in J.K.S.'s best interests to return her to G.S.T.'s custody when they had seen each other only several times in two or three years. Furthermore, the extension of the order would provide G.S.T. an opportunity to establish a meaningful relationship with J.K.S. To that end, we suggested that Cass County Social Services should conduct a home study and parenting-skills evaluation. *In Interest of J.K.S.*, 321 N.W.2d 491 (N.D.1982). Justice VandeWalle, concurring specially, noted that the social service agency would probably have to take affirmative action if the effort to unite G.S.T. and J.K.S. were to succeed.

In July 1983, the Cass County states attorney petitioned for termination of the parental rights of J.K.S.'s natural parents. Following a hearing on September 7, 1983, the district court issued a memorandum opinion and terminated G.S.T.'s parental rights on December 5, 1983. On March 5, 1984 the court issued an amended memorandum opinion terminating the rights and obligations of J.K.S.'s natural parents, placing the care, custody and control of J.K.S. in the Executive Director of the Social Service Board of North Dakota,[1] and authorizing that agency to consent to the adoption of J.K.S. G.S.T. now appeals from the order terminating her parental rights.

■ Before a court can order the termination of parental rights under § 27-20-

---

1. We note that pursuant to S.L. 1981, Ch. 486, § 40, the Social Service Board of North Dakota became the Department of Human Services, effective January 1, 1982. The custody of J.K.S. should actually be placed in the executive director of the Department of Human Services.

44(1)(b), NDCC, the State is required to prove by clear and convincing evidence three things: 1) that the child is a deprived child; 2) that the conditions and causes of the deprivation are likely to continue or will not be remedied; and 3) that because of the continuous or irremediable conditions and causes, the child is suffering or will probably suffer serious physical, mental, moral or emotional harm. *In Interest of J.N.R.*, 322 N.W.2d 465 (N.D.1982); *In Interest of R.W.B.*, 241 N.W.2d 546 (N.D.1976).

The threshold question is whether or not the child is deprived. Section 27–20–02(5)(a) of the North Dakota Century Code defines a deprived child as one who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian." The initial finding of deprivation was based primarily on G.S.T.'s demonstrated lack of concern for J.K.S., which continued through the 1981 review hearing and resulted in a finding of continued deprivation.[2]

■ Due process considerations may prevent a court from taking judicial notice of testimony of proceedings prior to the termination hearing. We have stated previously, however, that the juvenile court does not have to operate in a vacuum concerning the results of the earlier proceedings, particularly when the termination hearing is the culmination of a series of events and hearings. *In Interest of M.R.*, 334 N.W.2d 848, 852–53 (N.D.1983).

Testimony at the termination hearing showed that since the 1981 review hearing, a home study had been performed at the request of Cass County Social Services. The home was found to be clean and adequate for visits, but it was not recommended for permanent placement because of perceived problems that G.S.T. and her husband still needed to resolve, and because of frequent moves.

In regard to parenting classes, Kay McDonald held four parenting classes in Wahpeton where G.S.T. resided. G.S.T. attended two of those, but provided no explanation for her failure to attend all of the sessions. Individual counseling sessions in Fargo were set up later and G.S.T. attended some of them before she quit because of disagreements with Mrs. McDonald. G.S.T., on her own initiative, did sign up for a nine-week parenting class offered through the Wahpeton school system, but that had not started at the time of the termination hearing. G.S.T. had also babysat for several small children, whose parents testified that they had been pleased with her care.

There were at least 25 visits between G.S.T. and J.K.S. between the 1981 review hearing and the 1983 termination hearing. Most of those visits were arranged to coincide with the counseling sessions or with court appearances. There were also two overnight visits. G.S.T. testified that she did not visit more often and had cancelled some scheduled visits because of illness and lack of gas money. According to Beverly Bohn, of Cass County Social Services, the visits were insufficient to develop any real bonding or emotional attachment between J.K.S. and G.S.T. Mrs. Bohn further stated that G.S.T. had been told that gas money was available if she would set up a visitation schedule a month in advance, but G.S.T. failed to comply with that condition.

**2.** At the time of the second appeal, this court inquired why the State did not seek a termination of parental rights at that time. The petitioner responded that because of the Indian Child Welfare Act of 1978 (found at 25 U.S.C. §§ 1901 et seq.), the petitioner believed a termination proceeding would trigger the intervention of the Chippewa Indian Tribe who would probably obtain custody of J.K.S. and thus remove jurisdiction from the state courts to the tribal court. After the petition for termination was filed in the instant case, officials of the Turtle Mountain Band of the Chippewa Indian Tribe were notified and did indicate a desire to intervene. Prior to the hearing, however, the tribal judge informed J.K.S.'s guardian ad litem that the Tribe had decided not to intervene because J.K.S. had been placed with the same foster parents for such an extended period of time.

Our review of decisions under the Uniform Juvenile Court Act (Chapter 27–20, NDCC) is based on the files, records and minutes or transcript of the evidence presented to the juvenile court. The scope of review is not limited to a determination of whether or not the juvenile court's findings are clearly erroneous. Rather, we examine the evidence in a manner similar to that of a trial de novo. *McBeth v. J.J.H.*, 343 N.W.2d 355, 358 (N.D.1984). Although we are not bound by the juvenile court's findings, we do give them appreciable weight and recognize that the trial court had the opportunity to observe the demeanor of the witnesses. *Asendorf v. M.S.S.*, 342 N.W.2d 203 (N.D.1983); *In Interest of D.S.*, 325 N.W.2d 654 (N.D.1982). We conclude that there was clear and convincing evidence that J.K.S. was a deprived child.

The next element to be established is that the deprivation is likely to continue. We said in *McBeth, supra*, at 358, that the trial court at a termination hearing must necessarily take into account prior proceedings and events following those proceedings. Evidence of past deprivation and abuse is not sufficient by itself to conclude that deprivation is likely to continue. There must also be prognostic evidence. *In Interest of J.N.R., supra*, at 468.

The previous deprivation hearings showed an unwillingness on G.S.T.'s part to acquire the parenting skills deemed necessary by the social services agency. G.S.T. had also demonstrated a sporadic and, at times, non-existent interest in maintaining contact with J.K.S. Dr. Zimmerman, a clinical psychologist, testified that when he had evaluated G.S.T. in 1980 he thought she might be able to function as a competent parent if she were willing to work with people in order to develop parenting skills. Kathryn Freeman, who taught the parenting class through the Wahpeton school system, expressed reservations about G.S.T.'s ability to benefit from her program. Kay McDonald testified that G.S.T. could probably be an adequate parent to J.K.S. provided that G.S.T. had a lot of family, social service and professional support and experienced no personal crises in her own life.

Where there has been a reasonable likelihood that the natural mother may be capable of providing for the necessary care and support of her child we have not allowed the child to remain in foster care. *In Interest of M.M.C.*, 277 N.W.2d 281 (N.D.1979). We have been asked before to state a rule setting forth the time and effort that must be expended to help parents provide an adequate environment for their children before a termination of parental rights is sought. *In Interest of R.H.*, 262 N.W.2d 719 (N.D.1978). We said then, and we repeat now, that an arbitrary rule is not required and is not appropriate. Even though long-term and intensive treatment may assist the parents, it is not mandated if it cannot be successfully undertaken in a time frame that would enable the child to return to the parental home without causing severe dislocation from emotional attachments formed during long-term foster care. *In Interest of J.A.*, 283 N.W.2d 83, 95 (N.D.1979). We believe that the results of the prior proceedings and the prognostic evidence presented at the termination hearing provide clear and convincing evidence that the deprivation is likely to continue.

Finally, the State must establish that because of the continuing deprivation, the child will suffer serious physical, mental, moral or emotional harm. There was overwhelming evidence that J.K.S. has established strong bonding and emotional attachments to her foster parents and foster brother with whom she has resided for the past five years. Dr. Zimmerman's psychological evaluation of J.K.S. showed her to be a well-adjusted, healthy, normal child. He further testified that even a gradual change from the foster home to G.S.T.'s home would be emotionally traumatic to J.K.S. and that there would be a very significant risk of permanent emotional damage if J.K.S. were removed from her foster home. That testimony clearly supports the conclusion that J.K.S. would be harmed by

the lack of bonding or emotional attachment in G.S.T.'s home.

■ The primary purpose of the Uniform Juvenile Court Act is to protect the welfare of the child. The "best interest of the child" is one factor to be considered even though it is not the primary question before the court in a deprivation or termination proceeding. *In Interest of D.S., supra,* at 659; *In Interest of J.A., supra,* at 92. It is a factor of considerable concern whenever a child has been absent from its natural parents for such period of time as permits the development of a psychological parent-child relationship with others, e.g., *Mansukhani v. Pailing,* 318 N.W.2d 748 (N.D.1982). J.K.S. has not resided with her natural mother for more than a few weeks after her birth. She has lived in the same foster home for at least five of the most formative years of her life and has established close emotional ties with her foster family. The record does not show that J.K.S. has established a meaningful parent-child relationship with G.S.T. and her husband. The situation here is nearly identical to that in *Daley v. Gunville,* 348 N.W.2d 441 (N.D.1984), where we awarded custody of a child to the maternal grandmother instead of the natural mother.

While it is regrettable that the situation continued unresolved for as long as it did, we are convinced, after reviewing the entire record, that under the circumstances of this case it would not be in J.K.S.'s best interest to remove her from the only real home she has ever known. The order of the district court is affirmed.

ERICKSTAD, C.J., and GIERKE and SAND, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I reluctantly concur in the result reached in the majority opinion. During oral argument Justice Pederson asked counsel for the petitioner whether a social service agency is successful when it can reunite parent and child or when it can terminate parental rights. The answer was that in this case the agency is successful when parental rights are terminated. I thus believe the opinion writes the final chapter to a dismal failure not only on the part of G.S. but on the part of the social service agencies, the courts, and society in general. In *In Interest of J.K.S.,* 274 N.W.2d 244 (N.D. 1979), I authored an opinion for the court in which I indicated that although J.K.S. was born prematurely, and that G.S. was immature at the time of the birth, had no husband, no mother, and no family background to assist her in developing the needed skills, these were not necessarily continuing factors because G.S. as she matures might develop the needed skills to properly care for J.K.S. In a special concurrence to the opinion in *In Interest of J.K.S.,* 321 N.W.2d 491 (N.D.1982), I indicated that hopefully the aim of the social service agency was to reunite child and parent if possible and, to that end, affirmative action on the part of the agency was required. I interpreted the statements in the majority opinion relative to the opportunity for G.S. to establish a close relationship with her daughter and to a home study and parenting-skills evaluation to indicate that the county social service agency should make an affirmative effort to assist G.S. in establishing a relationship which would permit the mother and daughter to be permanently reunited. With the exception of G.S., all now acknowledge our failure to bring that about.

The record reflects that the social service agency did make an affirmative effort to assist G.S. in establishing the necessary relationship. The only real charge by G.S. is that after this court in 1982 urged the agency to make an affirmative effort to reunite mother and child, the agency retained the same social worker on the case when it was apparent there was antagonism between the social worker and G.S. It may be human nature for a person in the position of G.S. to resent what she believes to be interference on the part of the social worker. Although the social worker may have been more familiar with the case, perhaps it would have been better, in view

of the antagonism, if another social worker had been assigned to the case. But this court does not supervise the assignment of personnel within the agency and in any event the record does not reflect a serious lack of affirmative effort on the part of the agency to assist in improving the parenting skills of G.S.

Finally, I am concerned about reliance in the majority opinion on cases such as *Daley v. Gunville*, 348 N.W.2d 441 (N.D. 1984), and *Mansukhani v. Pailing*, 318 N.W.2d 748 (N.D.1982). They are cited for the purpose of supporting the statement that it is a factor of considerable concern whenever a child has been absent from its natural parents for such period of time as permits the development of a psychological parent-child relationship with others. That statement may be true but it was made in the context of a custody determination rather than a case involving the termination of parental rights. I believe reliance upon those cases in this instance merely serves to blur an important distinction which we have previously said we must recognize in reviewing these matters. We stated that in a deprivation or termination proceeding the best interest of the child is not the primary question before the court although that does not suggest that the interests of the child are not considered. See, e.g., *In Interest of J.A.*, 283 N.W.2d 83, 92, n. 5 (N.D.1979). Reliance on *Daley* and *Mansukhani* in the context of a termination case such as this is may well lead to the perception that we have established the passage of time during which the child is separated from the natural parent and placed with a foster parent as presumptive proof that the parental rights should be terminated. If that is the trend of the court in termination cases, I do not join it. In termination cases the standard, as I understand it, is that aside from all other factors the court must consider the fitness of the parents before termination of their rights with respect to a child. See, e.g., *McGurren v. S.T.*, 241 N.W.2d 690 (N.D. 1976).

In concurring in the result I rely upon the evidence that G.S. is not a fit parent.