**Carmen DINIUS, Plaintiff and Appellant,**

v.

**John DINIUS, Defendant and Appellee.**

**Civ. No. 890059.**

Supreme Court of North Dakota.

Nov. 20, 1989.

Stenehjem, Foss & Moore, Bismarck, for plaintiff and appellant; argued by Sherry Mills Moore.

Wheeler Wolf, Bismarck, for defendant and appellee; argued by Robert J. Snyder.

ERICKSTAD, Chief Justice.

Carmen Dinius appeals from a divorce judgment of the District Court for Oliver County which granted custody of her four children to their father, John Dinius, distributed the marital property, and ordered John Dinius to pay temporary spousal support. We affirm.

John and Carmen Dinius were married on April 12, 1975. Both were employed at the time of the marriage, but Carmen quit

her job several months later, when they decided to have a family. They now have four children. The children and their ages, at the initiation of this proceeding were: Angie, age 11; Landon, age 10; Jordon, age 7; and Jarret, age 4. Throughout the marriage, the Diniuses lived in a home 11 miles from Center. John was employed as a shift worker, while Carmen cared for the home and the children.

In March of 1987, Carmen filed for divorce. The trial court issued an interim order granting Carmen temporary custody, care, and control of the children and temporary support in the amount of $1,200 per month. The trial court also evicted John from the premises of the parties located at rural Center, North Dakota. John contested the amount of the support. On April 4, 1988, the interim order was amended by the trial court, reducing the amount of temporary support from $1,200 per month to $1,100 per month.

In July 1988 Carmen and John agreed that Carmen would move to Bismarck with the children and John would return to the family home near Center. Carmen then moved to a three-bedroom security apartment in Bismarck and currently attends Bismarck State College, working towards a Bachelor's Degree in Social Work.

John did not contest custody until approximately a month before the trial. The trial, which lasted four days, commenced on December 14, 1988. On January 9, 1989, the trial court issued its Findings and Memorandum Opinion granting the divorce, distributing the property, and awarding custody of the parties minor children to John. The trial court ordered John to pay $900 per month spousal support for 36 months beginning February 1, 1989.

Judgment was entered on February 15, 1989. On February 15, 1989, Carmen filed her notice of appeal. Carmen applied to the district court for a stay of the judgment to permit her to retain custody of the children during her appeal. The stay was denied.

On February 16, 1989, Carmen filed a request for stay of judgment pending appeal in this Court. On February 20, 1989, this Court granted the stay pending appeal.

Carmen raises two issues on appeal. First, Carmen contends that the trial court's judgment in placing the children with the father was clearly erroneous. Carmen also contends that the court did not equitably divide the property, because the court awarded to Carmen property which the parties did not own, as an offset against other property awarded to John.

▆ It is well established that a trial court's determinations on matters of child custody are treated as findings of fact. *Bashus v. Bashus*, 393 N.W.2d 748 (N.D. 1986); *Lapp v. Lapp*, 293 N.W.2d 121 (N.D.1980). The findings of the trial court will not be set aside on appeal unless they are clearly erroneous. Rule 52(a), N.D.R. Civ.P.

A finding of fact is determined to be clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Bashus, supra* at 750, citing, *Lapp v. Lapp*, 293 N.W.2d at 125; *Nastrom v. Nastrom*, 284 N.W.2d 576 (N.D.1979); *Bender v. Bender*, 276 N.W.2d 695, 697 (N.D.1979); *Bohnenkamp v. Bohnenkamp*, 253 N.W.2d 439 (N.D.1977). The trial court is vested with a great amount of discretion in matters of custody. *Gorsuch v. Gorsuch*, 392 N.W.2d 392 (N.D. 1986). Our scope of review is properly limited by the clearly erroneous rule because the trial court, having had an opportunity to listen to and observe the demeanor of witnesses, is in a much better position to ascertain the true facts than the appellate court which must rely on a cold record. *Bashus, supra*, at 750.

Carmen argues that the trial court's decision to grant custody to John was clearly erroneous. Carmen premises her argument on two basic points. Carmen first contends that the trial court clearly erred by finding that subsections 4 and 5 of section 14–09–06.2, N.D.C.C., applied to the benefit of John. Carmen also contends that the trial court did not give proper weight to her allegations that John abused her, that the trial court did not properly

take into account John's mental history, and that the trial court did not properly address Carmen's concerns about the possibility of sexual abuse of Angie by John.

This Court has established that the best interests and welfare of the child codified by our legislature in section 14–09–06.2, N.D.C.C.,[1] must dictate custody in a divorce action. *Bashus, supra* at 750.

The findings of the trial court indicate that its decision turned on subsections 4 and 5 of section 14–09–06.2, N.D.C.C.:

"4. The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

"5. The permanence, as a family unit, of the existing or proposed custodial home."

■ Carmen contends that the court erred in its consideration of her role as homemaker, psychological parent, and primary caretaker of the children. While the concept of the "psychological parent" relates to the stability and continuity of a relationship between a child and a caretaker, the concept is more applicable to a custody determination between a natural parent and another party who is not a natural parent. In *Daley v. Gunville*, 348 N.W.2d 441, 445 (N.D.1984), we said:

"The establishment of a psychological parent relationship does not, however,

end the trial court's inquiry. It merely furnishes a justification for the award of custody to a party other than the natural parent. It remains to be determined if such an award would be in the child's best interests."

Therefore, the "psychological parent" concept is inapplicable in this situation as we have a custody determination between two natural parents.

■ Carmen's analysis of her role as primary caretaker, however, does have merit. While this Court, in the past, has declined to adopt a presumption that it is in the child's best interest to award custody to a primary caretaker, being a child's primary caretaker is a relevant factor for determining custody. *Gravning v. Gravning*, 389 N.W.2d 621 (N.D.1986). Carmen contends that her role as homemaker and primary caretaker of the children is more pivotal to determining the stability and continuity of factor 4 than is John's job stability and the fact that John resides in the family's former residence. In her brief, Carmen states:

"Thus where the stability provided by leaving the children with their primary caretaker is deemed less stable because she has moved from Center to Bismarck to attend school, a move of only 45 miles, the weighing of the factors by the Court is contrary to the law. Their best interest is served by protecting the continuing

---

1. Section 14–09–06.2, reads:

*"Best interests and welfare of child—Court consideration—Factors.* For the purpose of custody, the best interests and welfare of the child shall be determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:

1. The love, affection, and other emotional ties existing between the parents and child.

2. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.

3. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

4. The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

5. The permanence, as a family unit, of the existing or proposed custodial home.

6. The moral fitness of the parents.

7. The mental and physical health of the parents.

8. The home, school, and community record of the child.

9. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

10. Any other factors considered by the court to be relevant to a particular child custody dispute.

"In any proceeding under this chapter, the court, at any stage of the proceedings after final judgment, may make orders about what security is to be given for the care, custody, and support of the unmarried minor children of the marriage as from the circumstances of the parties and the nature of the case is equitable." (§ 14–09–06.2, N.D.C.C. S.L.1979).

and stable relationship these children have in their day-to-day lives not by placing them in the same house in which they lived six months earlier. It is error to give custody to one parent simply because he is able to continue working and residing in the family home. Job stability is not indicative of emotional stability in the context of the parent-child relationship." [Cites omitted.]

There was conflicting testimony as to the role that John played in the raising of the children. John testified that he was involved with the parenting of the children including changing diapers, giving baths, making meals, grocery shopping, caring for the children when they were sick, and having the primary responsibility for discipline. Carmen claims that John was not involved with the children in their infancy, as she did all the home management and was responsible for the care of the children. Carmen does concede that as the children grew older, John was involved in grocery shopping, bathing, occasional school conferences, discipline, and in entertaining the children.

Although the document entitled "Findings and Memorandum Opinion" does not specifically discuss how the trial court weighed the fact that Carmen had apparently had the main responsibility for the care of the children, the trial court did stress the view that John "has the better of the going" in factors 4 and 5 of section 14-09-06.2, N.D.C.C.

The trial court made the following relevant determinations as to custody of the parties' four children:

"Turning first to custody, I find that both parents love their children, and the children love them. Both parents are willing and capable of acting as the custodial parent. Each party has leveled certain criticisms at the other's parenting ability with some justification. No parent, however, is perfect, and the criticisms are not such as could be considered a major factor in awarding custody.

"Both parties are mentally and physically healthy, although Mr. Dinius at one time suffered a major but short-lived bout of depression at a time when he had considerable reason to be depressed. I am satisfied there is no reason for concern in the context of child custody....

\* \* \* \* \* \*

"When these people were living together in the family home, they were not always getting along, but the family unit was fundamentally stable and the environment, satisfactory. Both parties have significant extended family in the immediate area, and there has been considerable involvement with them during the marriage. Mr. Dinius intends to continue living in the immediate area and working at the same job.

"As noted, Mrs. Dinius is attending school and will not be able to complete her training at B.S.C. She does not know where she will complete her education.

"The man she is seeing has children of his own. He and these children are spending considerable time with Mrs. Dinius and her children, and this is causing conflict. The children may be required to move several times before Mrs. Dinius gets settled into the new life she is attempting to make for herself.

"I do not make these observations critically but simply to observe that from the standpoint of stability and satisfactory environment, Mr. Dinius has the better of the going. The situation has been satisfactory, and if Mrs. Dinius is to retain custody, we would be moving from that situation to one in which the family situation is not only unknown but is already experiencing some difficulty.

"The Court, of course, is to consider the factors set forth in § 14-09-06.2, N.D.C.C. In essence, it appears to me, and I so find, that the factors contained therein are basically equal between these parents except with respect to Subsections 4 and 5, which, as I have just indicated, favor Mr. Dinius."

We are not convinced under the circumstances of this case that Carmen's status as the children's primary caretaker requires a custody placement contrary to that made by the trial court.

Carmen contends that the court is not reducing the instability for the children but enhancing it by removing them from the steady relationship with Carmen and placing them in the care of John, whose commitment and nurturing ability is speculative. In *Landsberger v. Landsberger,* 364 N.W.2d 918 (N.D.1985), we affirmed the trial court's finding that the custodial home proposed by the father would provide a more stable, permanent, and satisfactory environment for the children. In doing so, we noted that the father did not have as extensive knowledge in childcare as the mother, but that he had " 'the capacity of acquiring this knowledge and the resources to do so, having considerable family in the area.' " In the case at hand, the trial court noted that Carmen was attending Bismarck State College, but that she would not be able to complete her degree there and that she did not know where she would complete her education. The trial court also noted a conflict between the man Carmen has been seeing and Carmen's children. The court expressed concern that Carmen may be required to move several times before she gets settled into her new life. In *Landsberger,* as in the present case, the trial court was faced with a difficult custody choice between two fit parents. The trial court determined, as in this case, that the father would provide a more permanent and satisfactory environment for the children. It is especially appropriate that in close cases having to do with deciding custody of children between two fit parents that due regard be given to the trial court's opportunity to determine the credibility of the witnesses. *Bashus, supra* at 752; Rule 52(a), N.D.R.Civ.P.

In that respect, the trial court took into account Carmen's allegations that John abused her during the marriage. John also suffered a period of depression and indicated suicidal tendencies in 1987. John was hospitalized for approximately 72 hours and released on medication during this period. Dr. Terry Johnson testified that John's depression could have been triggered not only by the problems in the marriage, but also by the fact that John had just undergone an emergency appen-

dectomy. Dr. I.A. Santos evaluated John in October 1987. At that point, Dr. Santos saw no reason for inpatient treatment.

There was also some concern by Carmen over statements she claims John made concerning their oldest child, Angie. Carmen claims that John told her he was concerned about kissing Angie the way he kisses the boys because he is scared he is going to react sexually. John claims that he expressed his concern about what others might think when they viewed him kissing his daughter, not that he was concerned about his sexual reactions.

Our review of the findings of the trial court, being acutely aware of John's problems in the early part through the mid-part of the marriage, which he seems to have overcome and Carmen's problems in the latter part of the marriage, particularly as they relate to the unhappiness of the children over her most recent relationship with Chris Koppang and his family, cause us to believe that the trial court's disposition of custody is not clearly erroneous. In light of the fact that it is the current circumstances which the court was attempting to alleviate, we cannot conclude that a mistake has been made. Should this disposition, however, through time, prove to be unworkable or unwise, and thus not in the best interests of the children, the trial court has the continuing jurisdiction to make changes in that disposition, after an appropriate hearing, if a significant change of circumstances warrants. *Wright v. Wright,* 431 N.W.2d 301 (N.D.1988); *Miller v. Miller,* 305 N.W.2d 666 (N.D.1981).

Carmen next argues that the trial court erred in the distribution of the real property. Carmen asserts that the trial court, in dividing the marital property, awarded her property that is owned by her father and thus was not part of Carmen and John's marital property. Carmen contends that the remaining property granted to John totalled $11,623 more than Carmen received.

The trial court made the following relevant determinations as to the real property in controversy:

"The parties are in full control of the 40-acre tract, which came by way of deed from Mrs. Dinius's father, Mr. Hickel. Mr. Hickel and other family members control the 160 acres, however, which was also deeded by Mr. Hickel. These deeds, apparently, were never physically delivered to the parties but were recorded. Other deeds were made out to other family members. This was being done for tax purposes, in which the Government was being told that gifts were being made of the property. Consequently, it should be considered as gifts for other purposes as well. In addition, I cannot think of anything that is more significant in determining whether there was an actual or constructive delivery of a deed than is its actual recordation with the Register of Deeds....

 *  *  *  *  *  *

"A recap of the assets with the adjustments set forth herein reveals that Mrs. Dinius will receive personal property of a value of $16,247, and Mr. Dinius, $23,438. There are cash assets, including his pension fund, of $97,719, and real estate of $47,525, making a total valuation of assets of $184,929. The parties are agreed that the assets should be shared equally between them, which means each should receive $92,464.

"I am awarding Mrs. Dinius the land, less the house and outbuildings and the 40-acre tract on which the house is situated, all of which latter property, which has a value of $25,000, is awarded to Mr. Dinius. The value of the land Mrs. Dinius receives is $22,525. She has also received $2,500 previously and will be awarded $2,800 from the Lutheran Brotherhood account No. 26-04539-5, leaving a balance due her of $48,392, which should be satisfied from Mr. Dinius's pension fund at Baukol-Noonan."

The 40-acre tract awarded John was valued at $4,000, while the buildings awarded John were valued at $21,000.

Carmen does not contest John's receipt of the six acres on which the house and other buildings were constructed. She does not consider that six acres nor the other 194 acres in question as "marital property," however. Carmen does not see the issue as whether or not the 194 acres are or are not marital property, but rather as whether or not she and John owned the property. Carmen's position is that she and John do not own the land because there was no delivery of the deeds.

The trial court's determination on matters of property division are treated as findings of fact and will not be set aside on appeal unless clearly erroneous. *Fleck v. Fleck*, 427 N.W.2d 355, 359 (N.D.1988). It is a general rule, and in this state, required by statute, that for a deed to be valid there must be a proper and sufficient delivery of the instrument. The applicable statutory provisions are as follows:

"*47-09-06. Delivery of written transfer—Requirement—Presumption from execution.*—A grant takes effect so as to vest the interest intended to be transferred only upon its delivery by the grantor and is presumed to have been delivered at its date."

"*47-09-09. Constructive delivery.*— Though a grant is not actually delivered into the possession of the grantee, it is yet to be deemed constructively delivered in the following cases:

1. When, by the agreement of the parties, the instrument is understood to be delivered at the time of execution and the circumstances are such that the grantee is entitled to immediate delivery; or

2. When it is delivered to a stranger for the benefit of a grantee and his assent is shown or may be presumed."

Carmen's father, Ralph Hickel, gave Carmen and John some land during their marriage. Carmen and John built a home and other buildings on six acres of this land. They treated it as their own property, paying taxes on it, and making improvements on it. John contends that along with this six acres another 34 acres was included in the land given to Carmen and John. Carmen contends that this 34 acres was not discovered until the divorce proceedings had commenced. John concedes that he was not aware that the other 160 acres had

been deeded to Carmen and him until the divorce proceedings.

Whether there has or has not been delivery of a deed may be determined from the intention of the grantor. *First National Bank in Minot v. Bloom,* 264 N.W.2d 208, 210 (N.D.1978). Carmen contends that it was the intention of her father, Mr. Hickel, to pass the property on to Carmen and John upon his death and not before. Other similar deeds had been prepared by Mr. Hickel for his other children. John contends it was Mr. Hickel's intention to transfer the land to them immediately or upon their request. John bases this contention on the fact that one of Mr. Hickel's sons, Rodney, had received delivery of his deed upon his request of his father.

Whether or not there was actual or constructive delivery of a deed is a question of fact. *First National Bank in Minot, supra* at 210; *see Stark County v. Koch,* 107 N.W.2d 701, 705 (N.D.1961), and *Shuck v. Shuck,* 77 N.D. 628, 635, 44 N.W.2d 767, 772 (N.D.1950). Thus, the findings of fact of the district court that there was actual or constructive delivery of the deed will be upheld by this Court unless we conclude that these findings are clearly erroneous. Rule 52(a), N.D.R.Civ.P.

John relies on *Eide v. Tveter,* 143 F.Supp. 665 (D.C.N.D.1956), for the proposition that there is a presumption of delivery from the recording of a deed which can only be overcome by clear and satisfactory evidence. In *Eide* the grantor's original intention was to make a will, but after consultation with his attorney, a warranty deed subject to a reservation of a life estate in the grantor was prepared, signed, acknowledged, and left with his attorney for recording. When it was recorded it was returned to the grantor who then placed the instrument in his safety deposit box where it remained until his death. The issue was whether or not the grantor had intended to immediately part with title, thus immediately passing title to the grantee. The plaintiff who asserted his claim through a mineral lease contended that the grantor continued to deal with the land as his own, and rented the land to his children,

received income from a coal mining lease and thus did not intend to part with title immediately. The court construed the instrument to be a deed, conveying the title to said premises to the grantees therein, but subject to a life estate in favor of the grantor. The court in finding that there was a delivery of the deed through the recording said: "[t]he recording of a deed ordinarily creates a rebuttable presumption of its delivery to, and its acceptance by, the grantee." *Id.* at 671. The court went on to say:

"Considering all of the circumstances under which the grantor's actions were taken, and the fact of the relationship of the parties to the deed, and subsequent acts and conduct of all thereof, it appears to the Court that all of the grantor's acts are wholly consistent with a delivery with intent to immediately pass title. This Court is of the opinion that the evidence establishes an effective delivery and acceptance of the deed."

*Id.*

Carmen's contention is that her father's intention was not to have the ownership of the land pass to Carmen and John until his death. Mr. Hickel testified to the effect that he gave Carmen and John a plot of land upon which to build a house. He thought it was two or four acres, but could not really remember. Mr. Hickel testified that he did not realize he was giving them 40 acres at that time. Mr. Hickel also testified that his intention with the 160 acres was to retain control of it until his death, at which time it would pass to Carmen and John.

We addressed somewhat similar circumstances in *First National Bank in Minot v. Bloom, supra.* In *First National Bank,* the grantor signed a warranty deed, naming a grantee. The deed was found in a sealed envelope in the grantor's safety deposit box in a bank upon the grantor's death on which was typed: "To be delivered to Edgar Bloom upon my death." This deed was not recorded until after the death of the grantor. The issue was whether or not there was actual or constructive delivery of the deed to the grant-

ee. The grantor had paid the taxes on the land and helped farm the land for the first few years after the warranty deed was signed and acknowledged. The grantee contended that the grantor intended the land to pass to the grantee immediately upon the signing of the deed and acknowledging of his signature. The grantee relied on conversations with the grantor to the effect that the grantor said that after the grantor would pass on, the land would belong to the grantee. This Court affirmed the district court's finding that there was no actual or constructive delivery of the deed. In coming to that conclusion, we examined section 47–09–09(1), N.D.C.C., to determine whether or not there was constructive delivery. We said:

> "For subsection (1) to apply, the parties, the grantor and grantee, would have had to agree at the time of the execution of the instrument that the instrument was delivered.... In addition, for subsection (1) to apply, the circumstances would have had to have been such that the grantee was entitled to immediate delivery of the instrument. In this case, Edgar was never in a position to demand or secure immediate delivery of the deed during Gust's lifetime."

*Id.* at 211.

■ The distinguishing feature of *First National Bank in Minot v. Bloom*, from the case at hand, is that in this case the deed was delivered to the office of the Register of Deeds by the grantor and recorded. We believe that is a very significant difference and justifies a very different legal result. If we were to permit the official record of title to land to be other than what it purports to be, we would greatly reduce the credibility and signifi-

cantly jeopardize the stability of land titles in this state to the ultimate detriment of many from this time forward. In light of such disastrous consequences, we hold that the trial court's finding, in effect, that recording the deed in the Register of Deeds Office constituted delivery of the deed sufficient to transfer the title of land described therein, was not clearly erroneous. That being the case, it was proper for the trial court to consider the land described therein as property within the marital estate and subject to distribution in a divorce pursuant to the *Ruff–Fischer* guidelines.[2]

The judgment of the trial court is affirmed with costs on appeal to the appellee, John.

VANDE WALLE and GIERKE, JJ., concur.

LEVINE, Justice, dissenting.

In *Gravning v. Gravning*, 389 N.W.2d 621 (N.D.1986), I urged a presumption in favor of the primary caretaker in a custody contest between equally fit parents with children too young to voice a preference.

In this case I argue that, at the very least, the primary caretaker is entitled, under NDCC § 14–09–06.2(4) and (5) (hereafter factors 4 and 5), to receive recognition and that if factors 4 and 5 had been properly construed, the trial court not only should have, but in all probability would have, awarded custody to the primary caretaker, who in this case was the mother.

Whether or not primary caretaking deserves presumptive force, it is a relevant and significant factor in a custody decision.[1] We have acknowledged as much when we recognized that the primary caretaker concept "inheres in the statutory

---

**2.** *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966); *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952).

**1.** The majority recognizes that "being a primary caretaker is a relevant factor for determining custody," but undermines the theoretical underpinning of the primary caretaker by dismissing the "psychological parent" concept as inapplicable to interparent custody disputes. Yet, the reason to attach significance to primary caretaker status is because "the intimate interaction between young children and their primary caretakers creates a unique psychological bond be-

tween them" which is crucial to maintain. *See* O'Kelly, *Blessing the Tie That Binds: Preference for the Primary Caretaker As Custodian*, 63 N.D. L.Rev. 481, 484 (1987).

A psychological parent is "one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for a parent, as well as the child's physical needs." *Id.*, quoting J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child (1973).

factors" of § 14–09–06.2. *Gravning, supra* at 622. If trial courts are to have any guidance and this court is to conduct any meaningful, principled review, we should identify and analyze those statutory factors in which the primary caretaker concept "inheres."

This case gives us the opportunity to do so as to factors 4 and 5 because Ms. Dinius has squarely raised the issue. That is what distinguishes this case from *Gravning*, where it was not argued that factors 4 and 5, or for that matter, subsections 1, 2 and 3, reflect legislative recognition of the importance of primary caretaking. *See* O'Kelly, *Blessing the Tie That Binds: Preference for the Primary Caretaker As Custodian*, 63 N.D.L.Rev. 481, 505–508 (1987). Unfortunately, we did not avail ourselves of the similar opportunity in *Landsberger v. Landsberger*, 364 N.W.2d 918 (N.D.1985), but we should not perpetuate our oversight.

The trial court interpreted factor 4 to refer to job stability, and factor 5 to refer to continuity of residence in the immediate area where the family lived together [Center] before the marital breakdown. Concluding that Mrs. Dinius had to complete her education and was uncertain about where this would occur, while Mr. Dinius was living in Center and working at the same job, the trial court found that factors 4 and 5 favor Mr. Dinius.

That every child needs continuity of care from its psychological parent has been recognized by our Legislature in, at least, factors 4 and 5 of NDCC § 14–09–06.2. I do not see where the trial court has given any consideration of or weight to the fact that "Carmen apparently had the main responsibility for the care of the children." (Majority opinion p. 6.) I believe the trial judge clearly stated what he attached importance to in factor 4—that John has a certain job and because of that continuity, John prevailed under factor 4. In my view, the trial court misconstrued the meaning of factor 4 and overlooked entirely its intent

that the continuity and stability that are relevant are the continuity and stability of the child's emotional relationship with the psychological parent. The "stable, satisfactory environment and the desirability of maintaining continuity" of that environment are connected with more than a job location. They must refer at least to a significant degree, to continuity of the environment provided by the primary caregiver.

With regard to factor 5, "the permanence, as a family unit, of the existing or proposed custodial home," the Legislature surely had in mind something more than a physical structure or a geographical location. After all, the statute does not say family house or the town or city where the family lived together. It refers to a "custodial home," "as a family unit." If home is where the heart is, the "custodial home" surely is where the bonded psychological parent is—the center of family life, the anchor of continuity of the family unit.

If factors 4 and 5 had been properly construed to give any weight to a primary caretaker's significance to the children's best interests, custody in this case would have been awarded to the primary caretaker notwithstanding the children's resentment of the primary caretaker's paramour.[2] The problem with the trial court's construction of factors 4 and 5 is its predictable adverse impact on the children, in every case where one parent has remained in the home to care for the children and household. Upon dissolution of the marriage, that parent's "job" is no longer available because of financial circumstances. He or she must, therefore, seek a new job. Thus, if it is only job stability and geographical location that define factors 4 and 5, they will always be weighed against the primary caretaker (unless a new job is available in the same location without need for education or training, or unless education or training are locally available *and* future plans are known and future plans include

---

**2.** It is interesting that the children's resentment extended only to the primary caretaker's liaison, not to those of the noncustodial parent with whom they spent time on visitation. This sug-

gests the strength of the bond between children and caretaker and the children's heightened expectations of undivided care and attention from their primary caregiver.

continuous residence in the same location, all highly improbable.) *See, e.g., Landsberger v. Landsberger, supra.* Instead of inhering in the statutory factors as we have concluded in *Gravning,* the continuity and stability of the relationship with the primary caretaker are given no weight under factors 4 and 5 by the trial court. The crucial bond between the children and the parent who, for twelve years in this case, was the primary caregiver is overlooked entirely. Where, then, I must ask, does the concept of primary caretaker inhere?

By affirming the trial court, the majority pays mere lip service to the importance of the bond between children and primary caretaker to the best interests of those children. It also renders ineffective and meaningless our recognition that the primary caretaker concept inheres in the statutory factors. If either proposition is to have any meaning, we ought to hold that the trial court erred as a matter of law in construing factors 4 and 5 as it did.

The trial judge stated that, "I could make a decision in this case, in all probability, awarding the children to either one of the parents and have it stand up to appellate review." While I appreciate its candor, I believe the trial court's "flip-a-coin" mentality arises from its improper construction of the statutory factors in which it ignored entirely, or undervalued significantly, the legislative recognition of the importance of the primary caretaker in the lives of children.[3] Because the trial court did not give the weight due to the primary caretaker under factors 4 and 5, I would hold that it misapplied the law, thereby making its custody decision clearly erroneous. I would reverse.

I respectfully dissent.

MESCHKE, J., joins the dissent.

---

3. In *Landsberger v. Landsberger,* 364 N.W.2d 918 (N.D.1985), the same trial court construed the same factors in similar fashion. We upheld its construction while lamenting over the difficulty in resolving a close question. Further reflection and this case illustrate to me the error

MESCHKE, Justice, dissenting.

Reflection and experience tell me, too, that each of the statutory factors is not of equal value. When factors 4 and 5 are properly weighed, they go to the overriding importance of the stability, continuity, and permanence embodied in a primary caretaker's relationship with the children. Therefore, I join in Justice Levine's thoughtful dissent.

of our prior ways. Doubtless, the trial court will continue to construe factors 4 and 5 in similar fashion in favor of the parent who throughout the marriage held an out-of-the-home job which remains secure.