In the Matter of the GUARDIANSHIP AND CONSERVATORSHIP OF Nichole M. NELSON and Mirranda L. Nelson, Minors.

Dannielle SEIGNEUR, Petitioner and Appellant,

v.

Connie OLSON, Respondent and Appellee.

Civ. No. 930316.

Supreme Court of North Dakota.

June 28, 1994.

**16**

Ottmar & Ottmar, Jamestown, for petitioner and appellant; argued by Joanne H. Ottmar.

Gilje & Dalsted, Jamestown, for respondent and appellee; argued by Kenneth L. Dalsted.

MESCHKE, Justice.

We consider whether exceptional circumstances require continuation of custody of children with a stepmother-figure, by appointing her guardian when both natural parents are gone. Dannielle Seigneur, the stepmother-figure, appeals an order appointing an aunt, Connie Olson, guardian with custody of Nichole and Mirranda Nelson. We reverse and remand for entry of an order appointing Seigneur guardian with custody and scheduling visitation with Olson.

Jeff and Lynette Nelson married in 1980, and had two children. Nichole was born on February 6, 1981 and Mirranda on February 16, 1983. The girls were placed in Jeff's custody when Jeff and Lynette divorced in March 1985. Since then, Lynette has had very little contact with her daughters. After Jeff died in 1992, Lynette was notified of this guardianship litigation, but she chose not to participate. The trial court found that "for all practical purposes [Lynette] abandoned the children."

After the divorce, Jeff lived with the girls for over three years in Lisbon, the community where Jeff's parents and other relatives reside. Jeff's sister, Connie Olson, babysat and helped Jeff care for the girls while they were small. In 1988, Jeff met and moved in with Dannielle Seigneur, who had three boys from prior relationships: Scott, Seth, and Adrian. In August 1989, Jeff and Seigneur moved with the five children to Jamestown, where they lived together as a family. Seigneur's oldest son, Scott, soon moved to California to live with his father. Jeff worked outside the home, and Seigneur furnished most of the daily care for all four children. In October 1992, after a work accident, Jeff died.

Because Jeff had not designated a guardian for Nichole and Mirranda by will [*see* NDCC 30.1–27–02, and *compare* Uniform Probate Code § 5–202, 8 U.L.A. 441 (1983)], Seigneur petitioned to be appointed their guardian. Olson countered with her own petition for appointment as their guardian. Olson and Seigneur agreed that Judith Ganzer, public administrator, should be appointed conservator to handle the girls' financial affairs. Seigneur was appointed temporary guardian pending a final decision.

After a trial in July 1993, the trial court found that Seigneur "is a likeable person who has given much to these two young children and is deserving the love and concern of the children," while Olson "has not had an opportunity to care for the children to any great degree." The court "believe[d] the girls would be taken care of adequately by either party," but concluded that the Olsons had the longer "stable husband and wife relationship" and a child-rearing history proven by "children who appear to be on their way to stable and productive lives." The trial court appointed Olson guardian with custody, but failed to schedule any visitation with Seigneur. Seigneur appealed.

On appeal, Seigneur urges that the trial court used a mistaken view of the law because a blood relative has no custodial priority over the psychological parent that Seigneur had become. Seigneur also argues that, as a hearsay exception under NDREv 804, the trial court should have admitted testimony by a friend of Jeff's that Jeff once said "that he wished things would remain the same if something happened to him," implying then Seigneur should continue to care for his children. At least, Seigneur argues, the trial court should have scheduled some visitation for her, if not physical custody. We do not decide all these questions, because we agree that Seigneur's exceptional circumstances as a psychological parent require maintaining that relationship for the girls.

A trial court is authorized to appoint as guardian "any person whose appointment would be in the best interests of the minor." NDCC 30.1–27–06. We will not disturb a trial court's findings on guardianship unless they are clearly erroneous. NDRCivP 52(a); *Matter of Guardianship of Renz*, 507 N.W.2d 76 (N.D.1993). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it or if, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Matter of Guardianship of Braaten*, 502 N.W.2d 512 (N.D.1993). The best interests of the children, the standard for appointment of a guardian under NDCC 30.1–27–06, has developed well-fixed parameters in related custodial contexts where exceptional circumstances require continuation of an existing custody absent any countervailing factor.

A natural parent has the right, superior to that of any other person, to a child's custody and companionship unless there are exceptional circumstances. *Hust v. Hust*, 295 N.W.2d 316, 318 (N.D.1980). Yet, even a parent's right is not absolute. *Id.* A psychological parent's loving care and custody is an exceptional circumstance that often prevails over the custodial claim of even a natural parent or another satisfactory relative. This principle applies here as a long line of precedent demonstrates.

Fifty years ago, this court ruled that custody of an 11–year old girl should remain with her maternal grandmother, who had cared for her at the request of her parents since she was six months old, rather than be transferred to her father who had returned for her long after her mother had died. *Borg v. Anderson*, 73 N.D. 95, 11 N.W.2d 121 (1943). Similarly, in *McKay v. Mitzel*, 137 N.W.2d 792 (N.D.1965), this court upheld the trial court's determination that it was in the best interests of three children to remain in the custody of their maternal grandparents, instead of being placed with their father, where the children had been in the grandparents' care for nearly ten years; their mother, who had custody after a divorce and had mostly left them with the grandparents, had died; and their father had not sought their custody before.

In another case in this long line, *In Interest of D.G.*, 246 N.W.2d 892 (N.D.1976), we reversed a trial court's custody placement of a six-year-old boy with his father and directed that the boy be left with his maternal grandparents with whom he had lived his entire life. D.'s father left when he was one year old. His mother divorced his father when D.G. was two, while continuing to live with her parents. When the grandparents sought to adopt D.G., the trial court ruled that D.G. was deprived by his mother, who had a history of mental illness but, finding that any deprivation by his father was not likely to continue, refused to terminate his father's parental rights and ordered transfer of D.G. to his father's custody. This court affirmed denial of the adoption but reversed the placement, instructed the trial court to place permanent custody of D.G. with his grandparents, and explained:

> Once the child has been in the custody of a party, that custody will be changed *only* upon a showing that such a change is *necessary* to protect and promote the child's welfare.

246 N.W.2d at 895 (emphasis in original). We concluded that his grandparents had developed a parental relationship with D.G. and that "continuity in the child's life can be preserved by maintaining custody with the grandparents." *Id.*

Again, the psychological-parent relationship with two children, who had lived with their paternal grandparents for five years, was an exceptional circumstance that required they be kept in their grandparents' custody after their father died, rather than be transferred to their biological mother, who had remarried and had two more children. *Mansukhani v. Pailing*, 300 N.W.2d 847 (N.D.1980), appeal after remand, 318 N.W.2d 748 (N.D.1982). In those consecutive decisions, this court twice reversed custodial transfers of the two children to their mother, away from their paternal grandparents where they had lived after the parents divorced. Their father, who had recently died in an accident, had also lived with the grandparents. In the second opinion, this

court directed continued custody with the paternal grandparents, concluding that "a change of custody would have a disrupting and detrimental effect upon the children," and that "the circumstances of this case constitute exceptional circumstances which require that [the children] be placed in the legal custody of their grandparents," absent any "countervailing factor...." *Mansukhani*, 318 N.W.2d at 754. We stressed "the importance of continuity and stability in a child's life, ... as factors in determining what custody placement is in the child's best interests." *Id.* at 753. For the Olson children, too, the guardianship should preserve the continuity and stability of their relationship with Seigneur.

Continuity and stability of the child's relationship with her psychological parents, a maternal grandmother and her twenty-year companion, was the governing consideration in another custodial contest. In *Daley v. Gunville*, 348 N.W.2d 441 (N.D.1984), this court reversed the custodial transfer of a six-year-old child to her biological mother and directed her continued placement with the grandmother. "[A]fter reviewing the entire record, we are convinced that the circumstances of this case are insufficient to warrant the removal of a happy, healthy, well-adjusted six-year-old child from the only home she has ever known." *Daley*, 348 N.W.2d at 447. We rejected the trial court's "principal reliance on the uncertain status" of the grandmother's relationship with her companion of over twenty years, quoting from *Lapp v. Lapp*, 336 N.W.2d 350, 353 (N.D. 1983):

"... the circumstances of 'living together' alone does not mandate a transfer of custody. As always, the court's main priority is the best interests of the child involved."

*Daley*, 348 N.W.2d at 446. We stressed that her grandmother "has been the only source of stability and continuity" in the child's life. *Id.*

Once more, although in a divided decision, we reversed and remanded for a new trial the custodial transfer of a five-year-old boy to his natural mother from his paternal grandparents who had principal physical custody since the boy's birth. *Patzer v. Glaser*, 368 N.W.2d 561 (N.D.1985). Later, in *Patzer v. Glaser*, 396 N.W.2d 740, 744 (N.D.1986), we affirmed the renewed transfer to the mother from the grandparents on remand, absent evidence that the boy "would sustain serious harm or detriment if he were now placed in his mother's custody," based upon the trial court's findings that the boy loved his mother and, from continuous contacts, regarded her as a parent. In the second *Patzer* chapter, we explained that the *Mansukhani* and *Daley* decisions were based on "exceptional circumstances requiring, in the child's best interests to prevent serious harm or detriment to the child, that the child remain in the custody of the psychological parent(s) and not be transferred to the custody of the child's natural parent." *Patzer*, 396 N.W.2d at 744. If a biological parent's right to custody is subordinate to the best interests of a child to remain with a psychological parent, a biological relative's interest, like Olson's, is also subordinate to that of the psychological parent for the Nelson children that Seigneur has become.

■ The trial court here made one conclusion that particularly shows it was operating under an erroneous view of the law:

The court specifically finds that in entering its decision, it must look not to who may be deserving or to who provided the most care in the past, but what is in the best interests of the children in the future.

When both parents are dead or gone, the choice of a custodial guardian for children would usually be like an initial custody decision in selecting the most appropriate relative to raise them. However, in a case like this, selection of the person who has taken most care of the children and has become a psychological parent is mandated because the court is really modifying an existing custody arrangement.

The original divorce decree placed custody of the girls with Jeff who, during the last four years of his life, relied on Seigneur as their principal caretaker. Thus, this guardianship decision is factually like a custody modification, where a significant change of circumstances must be shown to change the existing custody arrangement:

When initially awarding custody, the trial judge determines the single issue of the child's best interests. Sec. 14–09–06.1, N.D.C.C. When modifying custody, the trial judge must determine two issues: whether or not there has been a significant change of circumstances since the original ... custody [placement] and, if so, whether or not those changed circumstances are such that a change in custody fosters the best interests of the child.

*Orke v. Olson,* 411 N.W.2d 97, 99 (N.D.1987). The custodial status quo is preferred, and there must be a compelling reason before changing an existing custody. *Blotske v. Leidholm,* 487 N.W.2d 607 (N.D.1992). A continuous, uninterrupted relationship is important to a child, and significant weight must be given to continuing an established custodial arrangement. *Orke v. Olson,* 411 N.W.2d at 100–101. That principle controls here.

Jeff and Seigneur together furnished the girls' care for years. Seigneur regards Nichole and Mirranda as her daughters, and they regard her as their mother. The testimony of Iris Walle, Nichole and Mirranda's maternal grandmother, evidences the compelling relationship between Seigneur and the girls.

> A ... [Seigneur] shows a lot of tenderness and love for these girls. They have got ... safe feelings towards her. At first, I felt that I was going to hate this woman.
> Q Why?
> A Because the girls were calling her Mom. I felt this title should be to their own mother, not to some other person. But, after observing her with the girls and visiting with her, there's no doubt in my mind that they belong with her.

Even Olson acknowledged that Seigneur and the girls have a significant relationship and that the girls "immediately bonded to her as a mother figure."

Seigneur has provided most of the girls' day-to-day care for years. While the girls are in school, Seigneur works for an agency helping people with disabilities. Seigneur's supervisor describes her as a "very caring person" who is "very dependable and reliable." This same reliable and caring attitude has been reflected in how Seigneur has nurtured the girls.

In Seigneur's care, the evidence is undisputed that both Nichole and Mirranda are happy, creative, and well adjusted. They both have many friends and have done extremely well in school. Nichole's sixth-grade teacher describes her as being a "real creative, mature student," and "socially well adjusted." Mirranda's fourth-grade teacher describes her as "an excellent student, straight A student ... very conscientious ... good natured." In short, Seigneur is Nichole and Mirranda's psychological mother, making a loving, caring home for them.

Each prospective guardian was interviewed by a court-appointed visitor who studied their homes. The visitor concluded that both Olson and Seigneur love the girls and each could provide a good home for them. The visitor concluded, however, that there would be a very negative impact on the girls if the Olsons, or someone else, attempted to interfere with the bonding between the girls and Seigneur. The court-appointed guardian ad litem likewise testified that, in her view, the Olsons were hostile to Seigneur to an extent that could hinder the relationship and bonding the girls have with Seigneur. The visitor reported that Seigneur considers the girls "her children" and that the girls see her as being their mother. Since custody with a natural parent is not possible, this custody decision is not nearly as difficult as those in *Daley v. Gunville, Mansukhani v. Pailing,* and like cases because Seigneur stands alone as a parent-figure to the girls.

The trial court concluded that, because Olson has successfully raised four children and has a husband who could be a father-figure to Nichole and Mirranda, Olson should be appointed guardian. That decision gives insufficient weight to the psychological parent-child relationship between Seigneur and the girls. Because the court held the erroneous view that it could not consider who has nurtured the girls the most in the past, its custody decision fails to preserve the existing relationship the girls have with Seigneur. After reviewing the entire record, we are convinced that the evidence does not warrant

removing Nichole and Mirranda from their home with Seigneur, where they have prospered as happy, healthy, and well-adjusted children. Therefore, we conclude that the trial court's appointment of Olson as custodial guardian is clearly erroneous and that Seigneur should be appointed guardian.

Still, the evidence also indicates it is important for Nichole and Mirranda to maintain a relationship with their paternal relatives, especially Olson and her family. In special circumstances, it is desirable to schedule visitation with someone who is neither a parent nor a grandparent to the child, when it is in the child's best interest. *Quirk v. Swanson*, 368 N.W.2d 557 (N.D.1985). Special visitation circumstances exist here, too.

Nichole and Mirranda have lost both parents. The girls have fared very well under these adverse conditions partly because they have been fortunate enough to receive additional attention and support from their paternal relatives. The court-appointed visitor testified about the importance of their continuing contacts with Olson and her family:

> I see it as very important. Not necessarily that the children feel very bonded to the Olsons, but the Olsons feel very bonded to the children.... [T]hey're family. They're all part of each others lives.... I see it as very important that those ties are maintained.

To mitigate the conflicts of this contest and to facilitate contacts between the girls and their paternal relatives, the trial court should designate a clear, specific, and fair visitation schedule with the Olsons.

The order appointing Olson guardian of Nichole and Mirranda is reversed, and the case is remanded with directions for appointment of Seigneur as custodial guardian and for entry of an appropriate visitation order consistent with this opinion.

VANDE WALLE, C.J., and SANDSTROM and NEUMANN, JJ., concur.

LEVINE, Justice, concurring.

I agree that the trial court's award of custody to Connie Olson was clearly erroneous because the trial court misapplied the law when it failed to recognize the exceptional circumstances of Dannielle Seigneur's status as the psychological parent and the serious harm to the children that would arise from their removal from her care and control and severance of their bond with her. Because neither Olson nor Seigneur is the natural parent of these children, neither enjoys the superior right of a parent to their custody absent exceptional circumstances. There are exceptional circumstances in this case which clearly favor Seigneur. Seigneur has functioned as the children's primary caregiver for over four years and the evidence is compelling that interference with the bond between the children and Seigneur will have a very negative impact on the children. There are no countervailing factors that weigh against Seigneur's custody. *Cf. Patzer v. Glaser*, 396 N.W.2d 740, 744 (N.D.1986) [holding that countervailing factors of natural parent's desire to establish parental relationship and child's compatability with natural parent outweigh exceptional circumstances of grandparents' psychological parenthood].

I, too, am definitely and firmly convinced that the trial court made a mistake and join that part of the majority opinion that is based on the exceptional circumstances of Seigneur's psychological parenthood, the harm to the children from breaking that bond, and the absence of countervailing circumstances.

However, I am concerned that the majority opinion will be misinterpreted as an invitation to third-party caregivers to seek custody of their charges. We should encourage involvement of extended family in childcare without endangering the parent-child relationship. "A young mother should be encouraged to seek reasonable help for her child from family members without the risk of losing custody to those proffer[ ]ing assistance." *Patzer v. Glaser*, 368 N.W.2d 561, 566 (N.D.1985) (Levine, J., dissenting). The majority's application of the standard used in our custody modification cases, in which we give great weight to stability and continuity, may have, I fear, the opposite effect and actually discourage involvement of extended family. Because it prefers the status quo, the custody-modification standard would fa-

vor the caregiver over the natural parent, which is contrary to the natural parent's superior right to custody.

I believe that the majority's analogy to our custody modification cases is unnecessary and, given its potential effect, undesirable.