In the Matter of the GUARDIANSHIP AND CONSERVATORSHIP OF John, James III, and Jamie NORMAN, Minor Children.

James E. NORMAN, Petitioner and Appellant,

and

Dee Mund, Petitioner,

v.

Susan LEINGANG, Guardian, and John, James III, and Jamie Norman, by and through their guardian ad litem, Melvin L. Webster, Respondents and Appellees.

Civ. No. 930310.

Supreme Court of North Dakota.

Sept. 2, 1994.

James E. Norman, pro se.

Kapsner & Kapsner, Bismarck, for respondent and appellee Susan Leingang, guardian; argued by Leslie B. Oliver.

Melvin L. Webster, Guardian ad Litem (argued), Bismarck, for respondents and appellees John, James III, and Jamie Norman.

NEUMANN, Justice.

This is an appeal from a county court's denial of a motion to remove the guardian of three minor wards. We remand for consideration of a request for oral argument, but retain jurisdiction of the appeal.

James Norman, Jr., (Norman) murdered his estranged wife, Pamela Norman, in the presence of their three minor children, John, James III, and Jamie Norman. Norman was convicted of a Class AA felony, and sentenced to life in prison.

Following the murder of their mother, the three minor children were placed in the temporary legal custody of Burleigh County Social Services. Temporary physical custody was given to Susan Leingang, Pamela's sister. On January 24, 1992, James and Dee Mund, the children's paternal aunt and uncle, petitioned the County Court for Burleigh County for guardianship of the children. On January 27, 1992, Leingang also petitioned the court for guardianship of the children. After considering both guardianship petitions, the county court concluded that the best interests of the children would be served

by granting Leingang's petition, and so ordered. Norman did not appeal this order.

On August 31, 1993, Norman made a motion to the county court, requesting removal of the children from Leingang's home due to abuse and neglect. After considering the briefs of Norman, Leingang, and the guardian ad litem, the county court denied Norman's motion. It is the denial of this motion to remove the minor children from the guardian's home from which Norman now appeals.

Norman, acting pro se, raises four issues: (1) whether the county court erred in denying Norman's motion to remove guardian Susan Leingang, (2) whether the county court erred in awarding Leingang guardianship over the three Norman children, (3) whether the county court judge should have removed herself from presiding over guardianship proceedings due to conflicts of interest, and (4) whether the county court erred in deciding the Rule 3.2 motion without oral argument. We address only the fourth issue at this time.

■ Norman argues that he should have been allowed to orally argue his Rule 3.2 motion to remove the guardian. Rule 3.2(a) of the North Dakota Rules of Court[1] provides that timely requests for oral argument must be granted. Requests for oral argument are timely when made within five days of the expiration of the time for filing briefs. *See* Rule 3.2(a). The rule contemplates the filing of a movant's brief and an answer brief for each adverse party.[2] The moving party's brief must be filed with the motion or within five days thereafter. The adverse party has ten days after service of the moving party's brief to serve and file[3] an answer brief. If the moving party's brief was served by mail, Rule 6(e), N.D.R.Civ.P., affords the adverse party an additional three days in which to serve and file the answer brief. *See, Moe v. Moe,* 460 N.W.2d 411 (N.D.Ct.App.1990). Rule 3.2 states that requests for oral argument are to be *made* (not served) within five days of the expiration of the time for filing *briefs*. The use of the plural suggests that the time for filing briefs refers to the deadline for filing the answer brief, and we so hold. The use of the word "made," rather than "served," suggests a requirement for a completed communication, such as a filing, and again, we so hold.

In this case Norman's motion and brief were served by mail on August 30, 1993. The responding parties then had ten days in which to serve and file their answer briefs, plus the additional three days granted by Rule 6(e), N.D.R.Civ.P., because Norman's brief had been served by mail. That makes September 12, 1993, the expiration of the time for filing briefs, and September 17 the deadline to make a request for oral argument. Norman mailed a reply brief on September 14. Rule 3.2 makes no provision for reply briefs, and the trial court arguably had

---

1. *"(a) Submission of motion.* Upon serving and filing a motion, or within 5 days thereafter, the moving party shall serve and file a brief and other supporting papers and the adverse party shall have 10 days after service of a brief within which to serve and file an answer brief and other supporting papers. Upon the filing of briefs, or upon expiration of the time for filing, the motion is deemed submitted to the Court unless counsel for any party requests oral argument on the motion. If any party who has timely served and filed a brief requests oral argument, the request must be granted. The party requesting oral argument must secure a time for the argument and serve notice upon all other parties. The court may hear oral argument on any motion by telephonic conference. The court may require oral argument and may allow or require testimony on the motion. Requests for oral argument or the taking of testimony must be made not later than 5 days after expiration of the time for filing briefs." NDROC 3.2(a).

2. Rule 3.2 neither permits nor forbids the filing of a reply brief by the moving party, thereby leaving that matter to the sound discretion of the trial judge.

3. Service is completed upon mailing. Rule 5(b), N.D.R.Civ.P. Filing, however, is not. *Moe v. Moe,* 460 N.W.2d 411 (N.D.Ct.App.1990). While it is not an issue in this case, arguably an answer brief mailed on the last day but not received and filed by the clerk of court until later would not be timely. This filing requirement also raises some difficulty in rural North Dakota, where the clerk of court and the assigned judge are often separated by more than a hundred miles, and counsel often follow the practice of mailing their motions and briefs directly to the judge for timely consideration.

no obligation to consider this one, because leave to file it had not been requested or granted. However, this reply brief also included a request for oral argument which the trial court was required to consider.

The reply brief and request for oral argument were filed on September 16, one day before the deadline for making a request for oral argument. When they were filed, the trial court had already issued the order from which Norman appeals; the order was signed, dated and filed on September 15. The trial court had acted prior to the deadline for requesting oral argument. There is no indication in the record that the trial court considered and acted upon the request after it arrived. We therefore remand for consideration of Norman's request, and for oral argument, if that request is granted, but we retain jurisdiction of the appeal under Rule 35(b), N.D.R.App.P.

■ While a prisoner's right to appear personally at a civil proceeding is limited, see, In Interest of F.H., 283 N.W.2d 202 (N.D.1979), we note that Rule 3.2 states that, "If any party who has timely served and filed a brief requests oral argument, the request must be granted." Rule 3.2(a), NDROC (emphasis added). Anton v. Anton, 442 N.W.2d 445 (N.D.1989). The rule also states that, "The court may hear oral argument on any motion by telephonic conference."

The appeal is remanded, and jurisdiction is retained.

VANDE WALLE, C.J., concurs.

MAURICE R. HUNKE, District Judge, sitting in place of SANDSTROM, J., disqualified.

MESCHKE, Justice, concurring.

I concur with Justice Neumann's analysis of NDROC 3.2, and with the remand for oral argument while retaining jurisdiction. If James Norman's procedural rights are material, I agree that is the correct analysis. I believe, however, that any procedural oversight below was harmless error, and I would prefer to affirm on the merits. I write separately to explain why.

In Norman's appeal from his conviction for murder, we gave the background of this case:

In the evening of January 13, 1992 James shot and killed his wife, Pamela Norman, in her home. James and Pamela's three children, Jamie, Jimmy, and John, witnessed the shooting. They told police officers that their mother had been shot by their father. Police found the murder weapon in James' automobile. James was arrested the next day, and he was charged with murder.

A jury found James guilty as charged, and he was sentenced by the district court to life imprisonment without possibility of parole for 30 years.

State v. Norman, 507 N.W.2d 522, 523 (N.D. 1993). We affirmed Norman's conviction for murder of the mother of his children.

After trial on the permanent appointment of their maternal aunt as the children's custodial guardian, the trial court ruled that Norman's long-term imprisonment for murdering the children's mother resulted in "terminat[ion] or suspen[sion] by circumstances" of "all parental rights of custody" for Norman. NDCC 30.1–27–04. As the children's father, Norman had been notified of the custody proceeding as an "interested party," but he did not appeal the order appointing the children's aunt as their custodial guardian, nor contest the conclusion that all of his parental rights of custody had been suspended by circumstances. See NDCC 30.1–27–04 ("terminated or suspended by circumstances or prior court order") (my emphasis). In moving to reconsider and change custody, Norman did not claim that the circumstances that suspended "all" of his custodial rights had changed in any way.

The adjudication that Norman's custodial rights are suspended, in my opinion, is the law of this case. See Tom Beuchler Const. v. City of Williston, 413 N.W.2d 336, 339 (N.D. 1987) ("[T]he law of the case encompasses not only those issues decided on the first appeal, but also those issues decided by the trial court prior to the first appeal which were not presented for review at the first appeal."); City of Minot v. Freelander, 426 N.W.2d 556, 559 (N.D.1988). The court order that all of Norman's parental rights of

custody have been suspended should preclude reconsideration, at least until a change of his circumstances is pled and shown.

In summarily denying Norman's motion to reconsider the custodial placement, the trial court reasoned:

> The court concluded that for all practical purposes the decision that was ... made was a custody decision.
>
> For the same reasons, and by analogy, the Court would have to be convinced there was a significant change in circumstances before a change of custody would be considered. James Norman has made no allegations which would satisfy such a burden.
>
> ....
>
> ... The children were victimized by James Norman and any serious consideration of this motion would simply serve to allow him to continue to victimize them and attempt to exercise unreasonable power and control over them.

(citations omitted). Because I agree with those reasons, I would prefer to affirm the summary denial of the motion to change custody, rather than remand for correction of any procedural omission.

A significant change of circumstances is a well-developed precondition to reconsideration of a custodial decree. We explained the reasons for that proposition recently in *Barstad v. Barstad*, 499 N.W.2d 584, 587–89 (N.D.1993):

> *Blotske* [*v. Leidholm* ], [487 N.W.2d 607 (N.D.1992) ] and *Delzer* [*v. Winn* ], [491 N.W.2d 741 (N.D.1992) ] capsulize the proposition that in a change of custody proceeding, the child's stability with the custodial [person] is a primary consideration, and the statutory factors [for custody] must be weighed with that primacy in mind. The *Blotske–Delzer* duo also cautions that a trial court should change custody only if a change in custody is necessary or required for the best interests of the child.... The maintenance of custodial stability and continuity "is a very compelling consideration." *Delzer, supra* at 744.
>
> ....

> [These are] superior benefits to [the child's] best interests that we have recognized to inhere in the finality of litigation and the stability of the ongoing custodial relationship.

(Some citations omitted). *See also,* another guardianship-custody case, *Seigneur v. Olson,* 519 N.W.2d 15, 17 (N.D.1994) (citations omitted).

> Once the child has been in the custody of a party, that custody will be changed only upon a showing that such a change is necessary to protect and promote the child's welfare.

*Id.* at 17 (quoting *In Interest of D.G.,* 246 N.W.2d 892, 895 (N.D.1976)). As we have explained in other cases, like *In Interest of T.H.,* 482 N.W.2d 615, 623 (N.D.1992), a statute allowing judicial reconsideration of a status decree "does not require an evidentiary hearing unless there is a reason for one."

Just as we will affirm a summary judgment when there is no material issue of fact and the result is a matter of law, we should affirm the summary denial of a motion to change a custodial placement when no change of circumstances has been pled.

> A trial court should act with "great caution and reluctance," as the trial court said it did here, in refusing a hearing on a motion about custody or visitation. Nonetheless, when such a motion has no visible merit, a trial court may dismiss it without holding a hearing. *See Patten v. Green,* 369 N.W.2d 105 (N.D.1985). This motion submitted nothing new. It only perpetuated an unpleasant dispute over a subject recently decided.... We affirm dismissal of this motion.

*Lithun v. DuPaul,* 449 N.W.2d 810, 811 (N.D.1989). These children have been in legal limbo too long. I believe that the trial court's summary denial of Norman's motion to reconsider custody should be affirmed on the merits, rather than procedurally delayed.

The tenet that, absent any redemptive reason, a murderous parent can be unfit and disqualified from any say about the custody of the deprived children flows from general, overriding, and established principles. I outline them.

Unfitness usually disqualifies a parent from custody. *See* 24 Am.Jur.2d *Divorce and Separation* § 980 (1983); *In re Krystal S.*, 584 A.2d 672, 674 and n. 5 (Me.1991) (to conclude that a parent's rights have been "suspended by circumstances," the court is required to find that the parent either abandoned the child or is unfit to care for the child). When that parent's rights to custody have been suspended, a murderous and unfit parent should have nothing further to say about the custodial placement of the deprived children unless a drastic change in his circumstances takes place.

A parallel disqualification of a murderous relative is deeply embedded in our law.[1] "A surviving spouse, ... who feloniously and intentionally kills the decedent is not entitled to any benefits under the will or under [intestacy statutes], and the estate of decedent passes as if the killer had predeceased the decedent." NDCC 30.1–10–03(1). 23 Am. Jur.2d *Descent and Distribution* § 101 (1983) explains:

It is generally, if not universally, true that a potential heir or distributee who feloniously brings about the death of his intestate will not be allowed to take and enjoy the property of the person so killed. In some states this result has been reached by the courts independently of any specific statute dealing with the matter, while in others it is expressly prescribed by statute....

(footnotes omitted). Property rights are no more important than human rights, and both can be forfeited for bad conduct. For me, it is a simple adjunct of the disqualification for murdering a relative to conclude that, absent a redemptive reason like self-defense, a murderous parent can be found unfit and legally disqualified from any say about custody of the deprived children.

Domestic violence should always affect a custodial decision. NDCC 14–09–06.2(1)(j) and (k). " 'Domestic violence' includes physical harm, bodily injury, ... or assault, not committed in self-defense, on the ... family or household members." NDCC 14–07.1– 01(2). "If the court finds credible evidence that domestic violence has occurred, this evidence creates a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child." NDCC 14–09–06.2(1)(j) (part only). Murder of these children's mother was extreme domestic violence. Extreme evidence would be necessary to show sufficient change to overcome that presumption in this case. No new circumstance was alleged by Norman that could change his presumptive disqualification. Therefore, I believe the trial court was correct, as a matter of law, in summarily dismissing his motion to reconsider the children's custody.

Elsewhere, a murderous parent has been disqualified as unfit for any role in custody of his children. In *Lucas v. Smith*, 201 Ga. 834, 41 S.E.2d 527, 528 (1947), when the father was charged with homicide of his wife, the trial court placed custody of his two small children with the maternal grandparents, ruling that the father "could not control the custody of his children." The paternal grandmother appealed, claiming that the father "had not lost his parental control and authority, and under the assignment of such parental authority to [her], she was entitled to the possession, custody, and control of the minor children." *Id.* at 529. The Georgia court affirmed the custodial placement. The court reasoned:

Ordinarily, a father may transfer and assign his parental authority, where the wife is dead, and such assignment would be valid. There is evidence, however, in this case, of "misconduct or other circum-

---

1. "The common law incidents of attainder [for conviction of a capital crime] have generally been abandoned under modern policies of law, and are forbidden by the Constitutions of many States," we explained in *Matter of Estate of Snortland*, 311 N.W.2d 36, 38 n. 1 (N.D.1981). *See also* N.D. Const. Art. I, § 18; NDCC 12.1– 33–02 (rights retained by convicted person). Yet, many collateral consequences of a felony conviction survive. For examples, *see* NDCC 12.1–33–

01 (rights lost); 23 Am.Jur.2d, *Descent and Distribution* § 99 ("Effect of life imprisonment") (1983); and NDCC 44–02–01(8) (A public office becomes vacant when "the incumbent shall ... [b]e convicted of a felony or any offense involving moral turpitude...."). The disqualification of a murderous parent from a voice in custody of the deprived children is a logical consequence of Norman's conviction.

stances" as to the father, which at least places him under suspicion as the murderer of his wife, the mother of the children. Such evidence makes this case exceptional on its facts, and authorizes a judgment based on the court's determination of what is best for the welfare and happiness of the children, independently of any expression or wishes of the father.

*Id.* at 529–30. *See Sturkie v. Skinner,* 214 Ga. 264, 104 S.E.2d 417, 422 (1958), affirming a custodial placement with the maternal grandparents, rather than the father, who was accused but not charged with the murder of the mother, where the trial court found "the father was an unfit person to have custody and control of his child and had therefore forfeited his parental right of custody." *See also George v. Anderson,* 217 S.E.2d 609, 610 (Ga.1975), affirming placement of two children with a maternal uncle and aunt, rather than a paternal aunt, where the father, who was imprisoned for killing the mother and maternal grandmother, had "entered into a custodial agreement with his sister for the custody and control of said minor children." The court reasoned at 611:

> Here the father killed the mother and maternal grandmother. He thereby, under the ruling in the *Sturkie* case, lost all parental rights. Thus the court here did not err in holding that the father had no parental rights to award as to custody to his sister, and his contract so to do was therefore invalid.

*Compare In Interest of H.L.T.,* 164 Ga.App. 517, 298 S.E.2d 33 (1982) (reversing termination of parental rights of father who pled guilty to voluntary manslaughter of mother of child in custody of maternal grandparents). These decisions demonstrate that a murderous father can be disqualified from a voice in custody of his children.

In *Nancy Viola R. v. Randolph W.,* 177 W.Va. 710, 356 S.E.2d 464 (1987), Mrs. R. sought custody of her four-year-old nephew after his father killed his mother. The trial court ruled that the father was fit and entitled to designate one of his relatives for custody, and appointed the designated guardian. After the father pled guilty to murder, Mrs. R. moved to reconsider, but the trial court denied reconsideration, too. On Mrs. R.'s appeal, the West Virginia Supreme Court summarily terminated the father's parental rights without further trial, appointed the West Virginia Department of Human Services as the permanent guardian of the child, and reversed to place temporary physical custody with Mrs. R. who "had been the child's primary caretaker since his mother's death over two years ago." *Id.,* 356 S.E.2d at 470. The court explained 356 S.E.2d at 470:

> [The father] had a history of abusing his spouse. That abuse irreparably affected his relationship with his son. Furthermore, his conviction of murder under the circumstances of this case support a finding that his parental rights should be terminated for the welfare of [the child].
>
> Aside from acts of abuse to the body and mind of a child, first degree murder of a child's parent is the ultimate act of savagery to that child. The emotional and psychological scarring the child has sustained as a result of his mother's death at the hands of his father is no doubt substantial. We can conceive of few circumstances in which the termination of parental rights would be more justified.

*Compare Veselits v. Cruthirds,* 548 So.2d 1312 (Miss.1989) (affirming custody to maternal grandparents but reversing cancellation of parental rights of father convicted, but later pardoned, of manslaughter of mother). *See also Kenneth B. v. Elmer Jimmy S.,* 184 W.Va. 49, 399 S.E.2d 192, 195 (1990) (affirming termination of parental rights of father convicted of second-degree murder of mother where "record contains no evidence of child abuse," and reversing decree ordering paternal grandparents to have joint custody of child in custody of maternal grandparents); *In Interest of Ditter,* 212 Neb. 279, 322 N.W.2d 642, 646 (1992) (affirming termination of parental rights of father convicted of first-degree murder of children's mother, rejecting father's argument that he "should be afforded the right to keep his parental rights so that he could arrange for the termination himself at his choice and select the family to adopt his children.").

Norman too has been adjudicated unfit to have any say in his children's custody. Absent a showing of any redemptive change in Norman's circumstances, we should affirm that holding.

For these reasons, I would prefer to affirm the trial court on the merits, rather than act on any procedural ground, even a temporary remand. Until my colleagues are ready to address the merits, however, I join in the opinion by Justice Neumann remanding for oral argument while retaining jurisdiction, even though I am doubtful that oral argument is likely to persuade the trial court to modify its summary dismissal of Norman's motion to reconsider custody.

MAURICE R. HUNKE, District Judge, concurring.

Having been the trial judge in *Anton v. Anton,* 442 N.W.2d 445 (N.D.1989), I sense a bit of irony participating in this decision. Justice Neumann's opinion reflects one of the several possible—and reasonable—applications of NDROC Rule 3.2 and I therefore concur in the result.

It is apparent from this case and others that the patchwork construction and amendment of NDROC Rule 3.2 through the years has created procedural folly in our motion practice. I suggest that the Joint Procedure Committee should revisit Rule 3.2 and fashion anew an efficient procedure for modern motion practice.

I also write separately to comment that all parties might have been better served if the trial court had referred this matter to Juvenile Court. Norman's motion alleged essentially, as did the initial petitions in this proceeding, that the children are deprived because of the violent death of their mother caused deliberately by their father and because of subsequent circumstances. NDCC 27–20–03(1) provides the Juvenile Court with "exclusive original jurisdiction" over such matters.

Among the beneficial aspects of confidential Juvenile Court jurisdiction would be to spare the children the glare and stare of yet more publicity. Such economic concerns of the children as require attention can be handled in a simple conservatorship.

LEVINE, Justice, dissenting.

I am struck by the inconsonance of the majority's analysis of Rule 3.2, NDROC. Even if a prisoner's request for oral argument must be granted under Rule 3.2, as the majority holds, Norman's so-called "request" was buried in a document entitled "Response Back on Sue Leingang's Response to Motion to Remove Minor Children From Guardian's Home." But, under Rule 3.2, there is no provision for, what is, in effect, a reply brief. On the one hand, the majority strictly construes the Rule to require a court to entertain a motion for oral argument by a prisoner who has been convicted of murder. On the other hand, the majority broadly construes Rule 3.2 to condone a reply brief as a vehicle to request oral argument even though the Rule does not authorize a reply brief. In my view, the trial court was not required to read a document that should not have been filed. Trial courts have enough to read. This one ought not be instructed by this court to read such a document in order to ferret out a request for oral argument.

I would reach the merits and affirm.