532 N.W.2d 653 (1995)
In the Matter of the ADOPTION OF J.S.P.L., J.J.L., and J.W.L.
M.L.L. and S.M.L., Petitioners and Appellees,
v.
Henry C. "Bud" WESSMAN, Executive Director, North Dakota Department of Human Services, Respondent, and
J.E.N., Respondent and Appellant.
Civ. No. 940243.
Supreme Court of North Dakota.
May 31, 1995.
*655 Leslie Bakken Oliver (argued), Kapsner & Kapsner, Bismarck, for petitioners and appellees.
J.E.N., Bismarck, pro se.
Melvin L. Webster (argued), Bismarck. Guardian Ad Litem.
LEVINE, Justice.
J.E.N. (Jack)[1], the natural father of J.S.P.L. (Joan), J.J.L. (Jeff), and J.W.L. (Justin), appeals from a judgment terminating his parental rights and granting the petition *656 of M.L.L. (Mark) and S.M.L. (Sandy) to adopt the children. We conclude that Jack's due process right to access to the courts was not violated and that clear and convincing evidence supported the termination of his parental rights. We therefore affirm.
Jack was convicted of the January 1992 murder of his wife, P.J.N. (Patty), a class AA felony, and he was sentenced to life imprisonment with no possibility of parole for at least 25 years. Jack violated a protection order restraining him from Patty's home and bribed his children to gain entrance to the home. When Patty returned from work, Jack shot her several times with a handgun in the presence of Joan, Jeff, and Justin, who were then ages 11, 8, and 4, respectively. Jack fled the scene, leaving the children with their dying mother. Patty was dead when police arrived and Jack was arrested shortly thereafter. Joan and Jeff testified against Jack at his murder trial.
Shortly after the murder, the children were placed in the physical custody of Patty's sister, Sandy, who successfully petitioned the court for guardianship of the children. In December 1993, Sandy and her husband, Mark, petitioned the court to adopt the children and terminate Jack's parental rights.
Jack requested court-appointed counsel to oppose the adoption. The court appointed attorney Edwin Dyer to represent Jack. Unsatisfied with Dyer's previous representation in a matter involving the children, Jack requested that Dyer be replaced with another attorney. The court denied the motion, and Jack filed a pro se resistance to the adoption petition.
Dyer then moved for Jack's personal appearance at the adoption hearing. Dyer also initiated pretrial discovery and moved for a continuance of the hearing. Mark and Sandy opposed the motion for Jack's personal appearance because Jack was represented by counsel and would have the opportunity to appear in the proceedings through a deposition taken at the state penitentiary. They argued that Jack, as a convicted murderer, was "an obvious and significant security risk." They also asserted that Jack should not be allowed to appear personally because the children would be testifying at the hearing, and, according to affidavits from the social workers who had been counseling Joan, Jeff, and Justin, the children were neither "emotionally nor psychologically ready to have any contact with" their father.
The trial court granted Jack's motion for continuance, but denied the motion for his personal appearance at the hearing because of the "potential danger and security, combined with inconvenience to prison authorities...." The court instead gave Dyer permission to depose Jack and present that testimony at the hearing.
Jack responded by filing a notice of dismissal of Dyer as his counsel and a statement that he would be proceeding pro se. Jack also filed a notice that he was canceling his previously scheduled deposition. After reciting the procedural history of the case, the trial court ruled:
"I am of the opinion that [Jack] has sought the dismissal of counsel in hopes that he may personally appear in Court as his own attorney. I have previously ruled on this issue. I will reiterate that [Jack] is a convicted murder[er] and a substantial risk of potential danger in security exists combined with the inconvenience and costs associated for prison authorities. In addition, I am satisfied that the integrity of the correctional system requires that [Jack] not be afforded all the rights of an ordinary citizen.[2] For these and all other reasons [Jack] will not be allowed in the courtroom. I have provided reasonable steps by allowing his counsel to take his deposition and to represent him at trial. This order was issued nearly ninety days prior to the trial on this matter.
"IT IS HEREBY ORDERED that [Jack] may be allowed to act as his own counsel, however, Mr. Dyer shall continue *657 to act as a legal advisor and be available to apprise [Jack] of his legal rights and to appear in the courtroom on behalf of [Jack] as requested by him and to represent his interests."
Jack then filed a flurry of pre-hearing motions, some of them repeating claims made in previous motions that had been denied in other legal proceedings pertaining to the children. Jack refused to be deposed.
The adoption hearing began in chambers. Dyer appeared at the request of the trial court "to continue on as [Jack's] legal advisor in the event [he] asks for legal assistance during the course of this matter." Jack appeared by telephone and declined any assistance from Dyer, asking "what is he doing there?" When Jack asked if he would be allowed to cross-examine witnesses, the trial court said he would not, because Jack had declined the assistance of Dyer with full knowledge that he would not be attending the hearing.
However, the trial court allowed Jack to orally argue the motions he had previously filed. Jack also testified on his own behalf over the telephone, and was questioned by the guardian ad litem and counsel for Mark and Sandy. Then, the telephone conference was concluded and the hearing continued in the courtroom. The children, the adoptive parents, the social workers, and the prosecutor in Jack's murder trial testified. Attorney Dyer did not cross-examine witnesses or otherwise participate in the hearing.
The trial court terminated Jack's parental rights and granted the adoption. The court ruled that Jack had abandoned the children; that he had deprived the children of both a mother and a father; that he was physically and mentally incapable of providing the necessary parental control of the children; that the condition and causes of his incapacity were irremediable, resulting in physical, mental, moral and emotional harm to the children; and that his consent to the termination of parental rights was unreasonably withheld. The court further ruled that Mark and Sandy were well qualified to adopt the children and that it was in the children's best interests to permit the adoption. Jack appealed.

I
Jack asserts that the trial court committed reversible error in not allowing oral arguments on his pre-hearing motions as he requested under N.D.R.O.C. 3.2(a). We disagree.
A Rule 3.2 request for oral argument must be granted to any requesting party, including a prison inmate, who has timely served and filed a brief. Matter of Norman, 521 N.W.2d 395, 397 (N.D.1994). See also Anton v. Anton, 442 N.W.2d 445, 446 (N.D.1989). Rule 3.2, however, requires that "[t]he party requesting oral argument must secure a time for the argument and serve notice upon all other parties." Jack did not do so. Failure to secure a time for oral argument renders the request incomplete. Huber v. Oliver County, 529 N.W.2d 179, 183 (N.D.1995).
Moreover, even if the trial court erred in denying several of Jack's motions without oral argument, the remedy would be a remand for oral argument. Norman, 521 N.W.2d at 397. Jack has already received that remedy. At the beginning of the adoption hearing, the trial court allowed Jack to orally argue the motions he had filed. Although Jack complains that he was not allowed enough time for oral argument, the latitude and extent of oral argument is within the sound discretion of the trial court. Matter of Norman, 524 N.W.2d 358, 362 (N.D.1994). Jack has not shown how he was prejudiced by the limited time for oral argument, or that the trial court abused its discretion.

II
Jack asserts that the trial court violated his right to access to the courts by not allowing him to personally cross-examine the witnesses at the adoption hearing. Under the circumstances, we disagree.
Although prisoners have diminished constitutional protections, they do maintain a due process right to reasonable access to the courts. Bounds v. Smith, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977); *658 Ennis v. Schuetzle, 488 N.W.2d 867, 870-871 (N.D.), cert. denied, ___ U.S. ___, 113 S.Ct. 626, 121 L.Ed.2d 558 (1992). See also Annot., State prisoner's right to personally appear at civil trial to which he is a partystate court cases, 82 A.L.R.4th 1063 (1990). Under North Dakota law, "a person convicted of a crime does not suffer civil death ... or sustain loss of civil rights ..., but retains all of his rights, ... including the right ... to sue and be sued...." N.D.C.C. § 12.1-33-02.
In In Interest of F.H., 283 N.W.2d 202, 209 (N.D.1979), this court held that a prisoner does not have an absolute constitutional right to personally appear in court and defend an action to terminate parental rights if the prisoner has been otherwise permitted to appear through counsel and by deposition. We ruled that whether a prisoner should be allowed a personal appearance is discretionary with the trial court, and set forth several factors for consideration.[3] In F.H., the trial court did not abuse its discretion in denying the out-of-state prisoner's motion because he was represented by counsel at the hearing and he appeared by deposition.
In Matter of Adoption of Quenette, 341 N.W.2d 619, 621 (N.D.1983), a majority of this court applied the F.H. rationale to affirm denial of a personal appearance by an in-state prisoner in an adoption proceeding. The prisoner in Quenette was represented by counsel at the hearing, but counsel declined the court's offer to depose the prisoner. Again, in Thompson v. King, 393 N.W.2d 733, 736 (N.D.1986), cert. denied, 479 U.S. 1098, 107 S.Ct. 1320, 94 L.Ed.2d 173 (1987), we affirmed denial of an out-of-state prisoner's request for a personal appearance at an adoption proceeding where the prisoner was represented at the hearing by counsel and was deposed for the hearing. Because of "the protections evident" in that case, we further held that no procedural due process violation resulted from the prisoner's inability to personally rebut the evidence presented at the hearing. Thompson, 393 N.W.2d at 737.
This case differs from our prior cases because of Jack's pro se status. Jack's request for a personal appearance was denied; yet, the trial court permitted Jack to represent himself and offered him assistance from advisory counsel. Although Jack testified by telephone, he was not allowed to personally cross-examine witnesses and he did not authorize his advisory counsel to conduct cross-examination. Here, two rights are implicatedself-representation and confrontation. Resolution of the procedural due process question in this case requires further examination of a prisoner's right of self-representation and right of cross-examination in an adoption proceeding where termination of parental rights are at stake.

A

SELF-REPRESENTATION
The United States Supreme Court has ruled that, as a corollary of an accused's sixth amendment right to counsel in a criminal case, the defendant also has a sixth amendment right to self-representation when the defendant knowingly and intelligently elects to act pro se. Faretta v. California, 422 U.S. 806, 836, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). In McKaskle v. Wiggins, 465 U.S. 168, 178, 104 S.Ct. 944, 951, 79 L.Ed.2d 122 (1984), the Supreme Court clarified that, although a defendant has no constitutional right to proceed pro se with standby counsel appointed, a defendant's sixth amendment self-representation right is not violated when a trial judge appoints standby counsel over the defendant's objection, so long as standby counsel's participation does not "effectively allow[] counsel to make or substantially interfere *659 with any significant tactical decisions, or to control the questioning of witnesses, or to speak instead of the defendant on any matter of importance, ..." (Emphasis in original). The Faretta self-representation right may be invoked by respondents in civil involuntary commitment proceedings. In Interest of R.Z., 415 N.W.2d 486, 488 (N.D.1987).
While the United States Supreme Court has not recognized a constitutional right to self-representation in civil cases, there is a federal statutory right of long standing to self-representation in civil cases under 28 U.S.C. § 1654. See Andrews v. Bechtel Power Corp., 780 F.2d 124, 137 (1st Cir.1985), cert. denied, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986); O'Reilly v. New York Times Co., 692 F.2d 863, 867 (2d Cir.1982); In re Las Colinas Dev. Corp., 585 F.2d 7, 12 (1st Cir.1978), cert. denied, 440 U.S. 931, 99 S.Ct. 1268, 59 L.Ed.2d 487 (1979). Like the constitutional right recognized in Faretta, a necessary part of the statutory right of self-representation is that a litigant cannot be coerced into accepting appointed counsel rather than proceeding pro se. Andrews, 780 F.2d at 137.
The United States Supreme Court has nevertheless recognized that pro se prisoners' rights to self-representation under the federal statute do not guarantee their personal presence at any particular stage of a civil proceeding unrelated to their imprisonment. In Price v. Johnston, 334 U.S. 266, 285-286, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), the court stated:
"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. Among those so limited is the otherwise unqualified right given by [28 U.S.C. § 1654] to parties in all the courts of the United States to `plead and manage their own causes personally.'"
The Court in Price, 334 U.S. at 284-285, 68 S.Ct. at 1059-1060, outlined the considerations a court should weigh when deciding whether to allow a prisoner to appear personally:
"[T]his discretion is to be exercised with the best interests of both the prisoner and the government in mind. If it is apparent that the request of the prisoner to argue personally reflects something more than a mere desire to be freed temporarily from the confines of the prison, that he is capable of conducting an intelligent and responsible argument, and that his presence in the courtroom may be secured without undue inconvenience or danger, the court would be justified in issuing the writ. But if any of those factors were found to be negative, the court might well decline to order the prisoner to be produced. [28 U.S.C. § 1654], in other words, does not justify an indiscriminate opening of the prison gates to allow all those who so desire to argue their own appeals."
[Footnote omitted]. The right of prisoners to argue their own appeals was uppermost in Price. Other courts have relied on its rationale to rule that pro se prison litigants have no absolute right to demand personal trial court appearances at any stage of civil actions unrelated to their imprisonment. See, e.g., Hernandez v. Whiting, 881 F.2d 768, 770-771 (9th Cir.1989); Muhammad v. Warden, Baltimore City Jail, 849 F.2d 107, 111-112 (4th Cir.1988); Holt v. Pitts, 619 F.2d 558, 560-561 (6th Cir.1980). See also Birdo v. Holbrook, 775 S.W.2d 411, 414 (Tex.Ct.App.1989).
An obvious problem in criminal cases is that savvy criminal defendants may attempt to manipulate the system by asserting and retracting their mutually exclusive rights to counsel and self-representation in order to delay or disrupt the proceedings. See, e.g., United States v. Goad, 44 F.3d 580, 591 (7th Cir.1995). One court's response to an apparent attempt to delay a proceeding to terminate parental rights was denial of a prison inmate's request to remove his court-appointed counsel and allow him to proceed pro se. In In re Gary U., 136 Cal.App.3d 494, 186 Cal.Rptr. 316 (1982), the father, an Arizona prisoner, could not be brought from the Arizona prison to the termination hearing in California. After pointing out that the Faretta constitutional right applies to criminal proceedings, the court noted the father "may not use his right of self-representation to *660 effectively foreclose the rights of his child to a judicial determination at least equally important to the minor's interests as to those of the father," and ruled that because the father "had no ability to appear at the hearing, through no fault of the court or interested parties to the proceeding, it follows he had no right to remove his counsel pursuant to a claimed right of self-representation he cannot possibly provide." Gary U., 186 Cal.Rptr. at 319, 320.
In North Dakota, an indigent parent facing termination of parental rights in an adoption proceeding under N.D.C.C. Chapter 14-15 has a state constitutional equal protection right to court-appointed counsel. Matter of Adoption of K.A.S., 499 N.W.2d 558, 563 (N.D.1993). This right to court-appointed counsel, however, may be waived. K.A.S., 499 N.W.2d at 567. Jack eventually waived this right and the trial court allowed him to proceed pro se. But, as the above decisions demonstrate, Jack's invocation of his right to self-representation did not create a correlative absolute right to personally appear at the adoption hearing.

B

CONFRONTATION
The sixth amendment right to confront and cross-examine witnesses applies to criminal prosecutions, not to civil proceedings for termination of parental rights. People in Interest of V.M.R., 768 P.2d 1268, 1270 (Colo.Ct.App.1989); Matter of Rich, 604 P.2d 1248, 1253 (Okla.1979); State ex rel. Juv. Dept. v. Stevens, 100 Or.App. 481, 786 P.2d 1296, 1298 (1990), cert. denied, 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991). Even in criminal prosecutions, the accused's constitutional right to confront witnesses is not absolute. Rather, the accused's right to confront and cross-examine, "in appropriate cases, may `bow to accommodate other legitimate interests in the criminal trial process.'" State v. Fischer, 459 N.W.2d 818, 820 (N.D.1990) (quoting Chambers v. Mississippi, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973)). In Maryland v. Craig, 497 U.S. 836, 849-850, 110 S.Ct. 3157, 3166, 111 L.Ed.2d 666 (1990), the Supreme Court, noting face-to-face confrontation is not "an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers," upheld a Maryland statute that allowed a child witness in a sexual abuse case to testify at trial outside the defendant's physical presence by one-way television, if the trial court determined that this procedure was necessary to protect the child's welfare.
A civil litigant's right to confront and cross-examine witnesses is generally secured by concepts of due process.[4] But confrontation and cross-examination "are not rights universally applicable to all hearings." Wolff v. McDonnell, 418 U.S. 539, 567, 94 S.Ct. 2963, 2980, 41 L.Ed.2d 935 (1974). See also Vitek v. Jones, 445 U.S. 480, 494-496, 100 S.Ct. 1254, 1264-1265, 63 L.Ed.2d 552 (1980). We have said that the right to confront witnesses is not an express constitutional right in civil cases, but we cautioned that the denial of the opportunity to cross-examine in a civil case affecting the parent-child relationship would raise significant due process problems. See Muraskin v. Muraskin, 336 N.W.2d 332, 335 n. 2 (N.D.1983). If rights similar to those granted by the sixth amendment exist in a termination of parental rights case, the reason is that fundamental fairness requires them in a particular case or category of cases. See Stevens, 786 P.2d at 1298.
In termination of parental rights cases, several courts have said that due process does not entitle a parent to personally confront and cross-examine a child witness if the child would be traumatized by the experience. See, e.g., In re Elizabeth T., 9 Cal.App.4th 636, 12 Cal.Rptr.2d 10, 13 (1992); In re Brock, 442 Mich. 101, 499 N.W.2d 752, 757 *661 (1993); In re Michael C., 557 A.2d 1219, 1220 (R.I.1989). Furthermore, in Matter of Guardianship and Custody of A.O., 157 Misc.2d 177, 596 N.Y.S.2d 971, 974 (1993), the court held that a prison inmate's inability to personally attend a parental rights termination proceeding and confront witnesses who may testify in support of termination would not offend due process.
We conclude that Jack had no absolute constitutional right to personally confront and cross-examine the witnesses at the adoption hearing. While Jack's self-representation and confrontation rights, when viewed separately, did not guarantee him a personal court appearance, we must consider the constitutionality of the procedure used here, where both rights were limited by the trial court.

C

DUAL LIMITATIONS ON SELF-REPRESENTATION AND CONFRONTATION
There is sparse authority addressing the propriety of limiting a criminal defendant's sixth amendment rights to both self-representation and to personally confront and cross-examine witnesses.
In Fields v. Murray, 49 F.3d 1024 (4th Cir.1995), a majority of an en banc Fourth Circuit Court of Appeals held that the trial court did not err in refusing to allow the defendant, assuming he had invoked his Faretta self-representation right, to personally cross-examine the young girls who were witnesses against him in his criminal trial on sexual abuse charges. The majority of the court applied the Supreme Court's confrontation clause analysis from Craig in the context of a defendant's right to self-representation under Faretta, and concluded that if a defendant's confrontation right could be limited in the manner provided in Craig, so too could a defendant's self-representation right. Fields, 49 F.3d at 1035. The court said that the defendant's self-representation right to personally cross-examine the witnesses could be restricted if the purposes of the self-representation right would have been "otherwise assured," and if denial of personal cross-examination was necessary to further an important public policy. Fields, 49 F.3d at 1035. The court reasoned:
"The elements of a defendant's self-representation right include `control[ling] the organization and content of his own defense,... mak[ing] motions, ... argu[ing] points of law, ... participat[ing] in the voir dire, ... question[ing] witnesses, and ... address[ing] the court and the jury at appropriate points in the trial.' McKaskle, 465 U.S. at 174, 104 S.Ct. at 949. As in Craig, one of these numerous elements, the right to question, or cross-examine, certain witnesses personally, was denied to Fields while the others would have been preserved. Denying personal cross-examination may have inhibited Fields' dignity and autonomy to some degree by affecting `the jury's perception that [he was] representing himself,' id. at 178, 104 S.Ct. at 951, but, as he would have conducted every other portion of the trial, his dignity and autonomy would have been `otherwise assured.' Craig, 497 U.S. at 850, 110 S.Ct. at 3166; see McKaskle, 465 U.S. at 182, 104 S.Ct. at 953 (allowing trial court to require standby counsel for pro se defendant even though it `may erode the dignitary values the right to self-representation is intended to promote'). Similarly, while Fields' ability to present his chosen defense may have been reduced slightly by not being allowed personally to cross-examine the girls, it would have been otherwise assured because he could have personally presented his defense in every other portion of the trial and could even have controlled the cross-examination by specifying the questions to be asked. As a result, we are convinced that the purposes of the self-representation right were better `otherwise assured' here, despite the denial of personal cross-examination, than was the purpose of the Confrontation Clause right in Craig when the defendant was denied face-to-face confrontation with the witnesses.
"As to Craig's second prong, the State had an extremely important interest in preventing Fields from personally cross-examining the young girls here. The Court in Craig determined that `a State's *662 interest in the physical and psychological well-being of child abuse victims' was `sufficiently important to outweigh ... a defendant's right to face his or her accusers in court' if denial of this face-to-face confrontation was necessary to protect the children from `emotional trauma.' Craig, 497 U.S. at 853-55, 110 S.Ct. at 3167-69. The State's interest here in protecting child sexual abuse victims from the emotional trauma of being cross-examined by their alleged abuser is at least as great as, and likely greater than, the State's interest in Craig of protecting children from the emotional harm of merely having to testify in their alleged abuser's presence. We have little trouble determining, therefore, that the State's interest here was sufficiently important to outweigh Fields' right to cross-examine personally witnesses against him if denial of this cross-examination was necessary to protect the young girls from emotional trauma."
Fields, 49 F.3d at 1035-1036. Some state courts have similarly ruled that requiring a pro se defendant in a criminal case to submit questions of a child witness to the court or to standby counsel instead of allowing personal cross-examination is not constitutional error if the child would be emotionally or mentally harmed by personal cross-examination. See State v. Taylor, 562 A.2d 445, 454 (R.I.1989); State v. Estabrook, 68 Wash.App. 309, 842 P.2d 1001, 1006 (1993). Contra Commonwealth v. Conefrey, 410 Mass. 1, 570 N.E.2d 1384, 1391 (1991).
Whatever the proper resolution of this issue in a criminal prosecution, in this civil proceeding to terminate parental rights, we do not believe the trial court committed constitutional error by denying Jack a personal appearance in court, thereby limiting both his right of self-representation and his right to cross-examine witnesses. The constitutionality of the procedure used here depends on a balancing of interests.

D

PROCEDURAL DUE PROCESS
In determining what process is due in a proceeding to terminate parental rights, we assess "the several interests that are at stake." Lassiter v. Department of Social Services, 452 U.S. 18, 25, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981). The elements to be balanced against each other are "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159. A parent's right to the companionship, care, custody and management of his or her children is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). The parent's interest in the accuracy and justice of the decision to terminate parental status is also a commanding one. Santosky v. Kramer, 455 U.S. 745, 758, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). The State, on the other hand, "has an urgent interest in the welfare of the child," and "shares the parent's interest in an accurate and just decision." Lassiter, 452 U.S. at 25, 101 S.Ct. at 2160. When the parent facing termination of parental rights is a prison inmate, the State's important interest in maintaining the confinement of the prisoner and the integrity of its correctional system must also be considered. See Price, 334 U.S. at 284-285, 68 S.Ct. at 1059-1060.
Notwithstanding the importance accorded the familial relationship, upon balancing the elements, we conclude that Jack was afforded procedural due process in these proceedings. The trial court's concern over the potential danger and security risk, along with the resulting inconvenience to prison and other law enforcement personnel, posed by allowing Jack to personally attend the hearing was certainly justified. A person who brutally murders his spouse in the presence of his three young children, is convicted of the crime, and is sentenced to life in prison, obviously poses a substantial risk of danger and to security when allowed to leave the confines of a prison. Jack's children were to testify at the hearing. The trial court was presented with evidence from the children's counselors that the children were not yet emotionally or psychologically prepared for *663 any personal contact with Jack.[5] The reluctance to allow personal confrontation is especially understandable in light of Jack's allusions during the criminal proceedings to his "hurt and disappointment" in the children for having testified against him. The State's interests in the integrity of its correctional system, as well as in the emotional and psychological welfare of the children, are substantial here.
We perceive little risk that the procedures used would lead to an erroneous decision in this case. The trial court was not required to appoint substitute counsel upon Jack's request, see In Interest of J.B., 410 N.W.2d 530, 532 (N.D.1987), and we believe the court fashioned a reasonable method, under the circumstances, to protect Jack's rights when he elected to proceed pro se. Although Jack was not allowed to personally attend the hearing, he controlled all other aspects of his defense. See Faretta. Jack was properly appointed standby counsel to assist him. See McKaskle. Appointment of standby counsel in an attempt to fully protect Jack's right to cross-examine witnesses was more salutary to Jack's self-representation right than eliminating the self-representation right altogether. Jack, as a party to the proceeding, had access to the court file at all times. Jack twice refused to be deposed, but the trial court nevertheless allowed him to testify by telephone at the beginning of the hearing. The trial court allowed Jack to submit additional documents to the court following the hearing. Jack could have authorized standby counsel to conduct cross-examination and otherwise represent his interests, a procedure not materially different from what we have ruled satisfies due process. See Thompson; Quenette; F.H. Or, Jack could have limited the role of standby counsel at the hearing to asking the witnesses questions submitted by Jack. See Fields. Instead, Jack chose to decline any type of assistance from standby counsel, which was also his right. See McKaskle.
The trial court did not deny Jack reasonable access to the courts. Jack simply refused to take advantage of the opportunities that were made available to him. The restrictions placed upon Jack were reasonable under the circumstances. We conclude that Jack was not denied his due process right to access to the courts in this case.

III
Jack raises several issues about the propriety of the proceedings resulting in the termination of his parental rights. We reject his arguments.

A
Jack asserts that the trial court erred in allowing the prosecuting attorney in his murder trial to testify at the hearing because she "had a special interest in the outcome of the case." According to Jack, the prosecutor tampered with the testimony of his children and bribed them to be witnesses against him at his murder trial.
Apparently, the prosecutor gave some candy to the children and Jack's defense counsel during a pretrial conference in her office. After the criminal trial, the prosecutor gave Joan a troll doll and Jeff a baseball cap "not as a bribe but in admiration" of the young children who, as eyewitnesses to their mother's murder, had demonstrated courage as witnesses.
Under N.D.R.Ev. 601, competency to be a witness is all but assumed, with few exceptions. See, e.g., N.D.R.Ev. 602 and 603. The evaluation of a witness is to be made by the fact-finder's assessment of the credibility of *664 the witness's testimony, rather than by reliance on standards for competence. Explanatory Note to N.D.R.Ev. 601. While this so-called "bribe" may have had a bearing on the prosecutor's credibility, it certainly did not disqualify her as a witness. See State v. Schill, 406 N.W.2d 660, 662 (N.D.1987).

B
Jack asserts that the judge should have disqualified himself from presiding over this case because he was biased. According to Jack, disqualification was required because the judge was presiding over his and Patty's divorce at the time of the murder and because the judge had knowledge of his conviction for the murder. Jack also asserts the judge engaged in improper ex parte communications.
The assertions of improper ex parte communications are unsubstantiated. Furthermore, a ruling adverse to a party in the same or a prior proceeding does not render a judge biased so as to require disqualification. See Norman, 524 N.W.2d at 360; Farm Credit Bank of St. Paul v. Brakke, 512 N.W.2d 718, 720 (N.D.1994). We fail to see how the judge's supervision of the divorce case and knowledge of a matter of public record made him biased. There is no evidence of actual bias or lack of impartiality.
C
Jack asserts that the trial court erred in terminating his parental rights. We disagree.
We need not decide whether the trial court correctly decided that Jack had abandoned the children, because there are other grounds on which the termination was based. The other grounds for termination of parental rights under both N.D.C.C. § 14-15-19(3) of the Uniform Adoption Act and N.D.C.C. §§ 27-20-44(1)(b) and 27-20-02(5)(a) of the Uniform Juvenile Court Act essentially condense into the same three-part test: "(1) Is the child deprived? (2) Are the conditions and causes of the deprivation likely to continue? (3) Is the child suffering, or will the child in the future probably suffer, serious physical, mental, moral, or emotional harm?" Matter of Adoption of P.R.D., 495 N.W.2d 299, 301-302 (N.D.1993). The party seeking termination has the burden of establishing each of these factors by clear and convincing evidence. In Interest of L.J., 436 N.W.2d 558, 560 (N.D.1989). Our standard of review is similar to trial de novo. In Interest of C.S., 417 N.W.2d 846, 847 (N.D.1988). This record contains clear and convincing evidence to support the termination of Jack's parental rights.
We agree with Jack that his incarceration alone is insufficient to warrant termination of his parental rights. See Quenette, 341 N.W.2d at 622. But there is more here. We also agree with Jack that incarceration for the crime of murder may be insufficient in itself to warrant termination of parental rights. See Bush v. Dietz, 284 Ark. 191, 680 S.W.2d 704 (1984); Matter of L.A.S., 258 N.J.Super. 614, 610 A.2d 925 (1992). But again, there is more here. We further agree with Jack that one parent's killing the other parent may not in itself warrant termination. See In Interest of H.L.T., 164 Ga.App. 517, 298 S.E.2d 33 (1982). But there is much more here.
In Bush and L.A.S., both relied on by Jack, the murder victims were not the other parents of the perpetrators' children. In H.L.T., also relied on by Jack, the father had been convicted of voluntary manslaughter of the child's mother, a crime which recognizes mitigating circumstances, the guardian ad litem did not recommend termination, and the father was eligible for parole the following month. In this case, Jack intentionally and brutally murdered Patty in front of his children and left the children alone to watch their mother die. As one court has aptly observed in the context of an intentional murder of the mother by the father:
"It is difficult to conceive of a more calamitous event for a child than the murder of her mother by her father. It is absurd for the perpetrator of such a vile act to argue that he should retain his parental rights concerning that child. We can presume that father knew of the probable devastating effect of his actions on [the child] and of the inevitable lengthy *665 separation from [the child] as a consequence of his incarceration. The crime itself creates an irreparable emotional estrangement of the child from the father. His lengthy sentence will result in a physical separation during all of [the child's] formative years. There is not a scintilla of hope that he could actually resume his parental responsibilities."
In Interest of A.R.M., 750 S.W.2d 86, 89-90 (Mo.Ct.App.1988).
Contrary to Jack's assertion that "[a] death is a deathyou can butter it any way you want," courts have uniformly held that the nature of the parent's crime for which he or she is incarcerated is indeed a very relevant factor in deciding whether to terminate parental rights, and that the intentional murder of the child's other parent may be sufficient in itself to support termination. See, e.g., Heath v. McGuire, 167 Ga.App. 489, 306 S.E.2d 741, 743 (1983); In re Abdullah, 85 Ill.2d 300, 53 Ill.Dec. 246, 249, 423 N.E.2d 915, 918 (1981); Matter of Adoption of Doe, 99 N.M. 278, 657 P.2d 134, 136 (1982); In re Hederson, 30 Ohio App.3d 187, 507 N.E.2d 418, 420 (1986); Matter of Troy M., 27 Or.App. 185, 555 P.2d 933, 935 (1976); In re Adoption of M.J.H., 348 Pa.Super. 65, 501 A.2d 648, 656 (1985); Matter of B.A.M., 290 N.W.2d 498, 502 (S.D.1980); Kenneth B. v. Elmer Jimmy S., 184 W.Va. 49, 399 S.E.2d 192, 196 (1990).
The circumstances of Jack's crime present a paradigm of parental unfitness and resulting continuing deprivation of the children. Moreover, testimony from the counselors established that Jack had abused the children before the murder and that the children were, and continue to be, frightened of him. They now suffer, and will continue to suffer, serious psychological and emotional damage from having witnessed the murder. Although Jack seeks to maintain contact with the children so the "True and Real Healing Process," necessitated by what he refers to as the "Tragedy," can take place, the evidence established that his further contact with the children would cause further serious harm to them.
There is clear and convincing evidence in this case to support the trial court's termination of Jack's parental rights.

IV
Jack also asserts that the trial court erred in denying his discovery motions to obtain financial and other records pertaining to the adoptive parents and the children's trust fund. He also objects to the court's ruling that the guardian ad litem's fees be paid from the trust fund and asserts Mark and Sandy should not have been permitted to adopt the children. Jack is in no position to make these arguments.
We have concluded that the trial court properly terminated Jack's parental rights. Under N.D.C.C. § 14-15-19(4), the termination of Jack's parental rights made unnecessary his consent to the adoption of the children or notice of the adoption hearing. Jack simply no longer has standing to object to anything concerning the children or their adoptive placement. See Suster v. Dept. of Human Services, 314 Ark. 92, 858 S.W.2d 122, 125 (1993); In Interest of C.B., 221 Ill.App.3d 686, 164 Ill.Dec. 553, 554, 583 N.E.2d 107, 108 (1991); Matter of Adoption of M.M.B., 376 N.W.2d 900, 901 (Iowa 1985); Hill v. Garner, 561 S.W.2d 106, 108 (Ky.Ct.App.1977); Barrow v. Durham, 574 S.W.2d 857, 860 (Tex.Ct.Civ.App.1978); In re Dependency of G.C.B., 73 Wash.App. 708, 870 P.2d 1037, 1042 (1994). As one court put it:
"[A]fter a parent's parental rights have been terminated under the Act, that parent has no remaining residual rights of any kind, nor does that parent have any standing to raise any concerns or state any preferences regarding the ultimate placement of his or her child for adoption. When viewed from the perspective of the child, the parent whose parental rights have been terminated no longer exists. To be blunt, the situation is as if the parent had died."
C.B., 164 Ill.Dec. at 554, 583 N.E.2d at 108 (emphasis in original). Because Jack does not have standing to raise these issues, we do not address them.
*666 We have considered the other arguments raised by Jack and deem them to be without merit. The judgment terminating Jack's parental rights and granting the petition of Mark and Sandy to adopt the children is affirmed.
VANDE WALLE, C.J., NEUMANN and MESCHKE, JJ., and RALPH J. ERICKSTAD, Surrogate Judge, concur.
RALPH J. ERICKSTAD, Surrogate Judge, sitting in place of SANDSTROM, J., disqualified.
NOTES
[1] All names of the parties in this case are pseudonyms.
[2] To the extent this statement by the trial court can be interpreted as meaning a prisoner may be denied a personal court appearance for a purely punitive reason, it is incorrect. As we discuss later in this opinion, prisoners have a right of access to the courts, and although prisoners may be denied personal court appearances for a variety of reasons related to their imprisonment, additional punishment is not among them. See infra, at p. 658 and n. 3.
[3] Relying on Stone v. Morris, 546 F.2d 730, 735-736 (7th Cir.1976), we said:

"In making its determination the trial court may take into account the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom, any potential danger or security risk which the presence of a particular inmate would pose to the court, the substantiality of the matter at issue, the need for an early determination of the matter, the possibility of delaying trial until the prisoner is released, the probability of success on the merits, the integrity of the correctional system, and the interests of the inmate in presenting his testimony in person rather than by deposition."
In Interest of F.H., 283 N.W.2d 202, 209 (N.D.1979).
[4] These rights may also be provided by statute. For example, N.D.C.C. § 27-20-27(1) of the Uniform Juvenile Court Act provides:

"27-20-27. Other basic rights.
"1. A party is entitled to the opportunity to introduce evidence and otherwise be heard in his own behalf and to cross-examine adverse witnesses."
Jack does not rely on this statute as the basis for his claimed right to personally confront and cross-examine the witnesses.
[5] In its rulings denying Jack's request for a personal appearance, the trial court made no explicit findings on the emotional or psychological effect Jack's personal court appearance would have on the children. The trial court, however, after noting the potential danger and security risk, stated that "[f]or these and all other reasons [Jack] will not be allowed in the courtroom." (Emphasis added). Besides the potential danger and security risk, the only other reasons given by Mark and Sandy for opposing Jack's request for a personal court appearance were the documented emotional and psychological damage that would be suffered by the children if personal contact were allowed. While we would have preferred explicit findings on this matter, it is evident from the record that the trial court accepted the opinions of the children's counselors and implicitly found that personal contact with Jack would emotionally and psychologically harm the children.